Richard A. DAYNARD, Plaintiff,

v.

NESS, MOTLEY, LOADHOLT, RICH-
ARDSON & POOLE, P.A.; Ron-
ald Motley, Defendants.

No. CIV.A.01–10099–WGY.

United States District Court,
D. Massachusetts.

March 13, 2002.

Edward J. Barshak, Sugarman, Rogers, Barshak & Cohen, Boston, MA, for Plaintiff.

Michael E. Mone, Patricia L. Kelly, Esdaile, Barrett & Esdaile, Boston, MA, Mark A. Pogue, Edwards & Angell, LLP, Providence, RI, Stephen M. Prignano, Edwards & Angell, LLP, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

The groundbreaking litigation against tobacco companies has yielded enormous settlement awards for plaintiffs and concomitant fees for attorneys.[1] Distributing those fees has spawned a great deal of satellite litigation, including this dispute between a professor of law, putatively an expert on tobacco litigation, and a law firm that allegedly utilized his expertise to win massive settlements for its clients. The professor seeks to enforce an oral fee-splitting agreement. This memorandum and order addresses two issues: (i) what law governs this dispute; and (ii) whether an oral fee-splitting agreement made in contravention of the rules of professional conduct is nonetheless enforceable.

## I. INTRODUCTION

The facts of this case are documented in two prior decisions of this Court, *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F.Supp.2d 9 (D.Mass.2001) (*"Daynard I"*); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 184 F.Supp.2d 55 (D.Mass.2001) (*"Daynard II"*). In brief, Professor Richard A. Daynard ("Daynard") of Northeastern Univer-

sity School of Law has spent much of his academic career studying how to defeat the tobacco industry in court. *See* Deborah E. Feldman, *Where There's Smoke There's Daynard,* Northeastern L. Mag., Winter 2002, at 14. From 1993 to 1997, he advised two firms including the defendants—a South Carolina firm, Ness, Motley, Loadholt, Richardson & Poole, P.A., and one of its partners, Mr. Motley (together "Ness Motley"). Ness Motley represented several state governments in the titanic battle against the tobacco industry (the "State Tobacco Litigation"). No written contract detailed how Daynard would be compensated, but Daynard alleges that the parties eventually agreed he would receive five percent of any attorneys' fees paid to Ness Motley as a result of the State Tobacco Litigation. The tobacco industry eventually settled the State Tobacco Litigation for billions of dollars. Ness Motley's cut of the attorneys' fees approaches or exceeds $2,000,000,000.00, yet Daynard received nothing.

Daynard filed a complaint in state court, subsequently removed to this Court, which seeks, among other things, enforcement of the oral fee-splitting agreement or, in the alternative, recovery on a quantum meruit basis. Other named defendants were dismissed for want of personal jurisdiction at a hearing on September 13, 2001. Hr'g Tr. at 28 [Docket No. 60]. At that same hearing, Ness Motley sought summary judgment, which was denied in part and taken under advisement in part. This Memorandum addresses the issues that were taken under advisement at that hearing.

---

1. One professor estimates that attorneys' fees arising out of the tobacco litigation "will amount to at least $15 billion over the next twenty-five years and will continue to accrue at the rate of $500 million a year thereafter for probably at least a half-century or more." Daniel J. Capra et al., *The Tobacco Litigation and Attorneys' Fees,* 67 Fordham L.Rev. 2827, 2830 (1999) (remarks of Cardozo Law School Professor Lester Brickman).

## II. DISCUSSION

Ness Motley vigorously disputes Daynard's claim that an oral fee-splitting agreement existed. Ness Motley asserts, as it did at the summary judgment stage, that even if such an agreement existed, it is unenforceable as matter of law. *See* Defs.' Mem. at 15–18 [Docket No. 25]. Consideration of this argument requires, as a preliminary matter, determination of what law will govern the enforceability of the agreement. Once the governing law has been determined, the Court must then determine whether that law would enforce an oral fee-splitting agreement.

### A. Choice of Law

■ As was more fully discussed in the Court's previous decisions, there are four jurisdictions that might supply the governing law: Massachusetts, New York, South Carolina, and Mississippi.[2] Daynard performed his research and writing, met with Ness Motley partners, and allegedly formed a compensation contract in Massachusetts. Daynard is licensed to practice law in New York. Daynard consulted on tobacco suits in various states, including Massachusetts and Mississippi. *Daynard II*, at 61–62. Ness Motley is a South Carolina law firm. The defendants dismissed for want of personal jurisdiction are a law firm in Mississippi and one of its partners.

■ "When facing a claim that does not arise under the Constitution or the laws of the United States, a federal court must apply the substantive law of the forum in which it sits, including that state's conflict-of-laws provisions." *Dykes v. DePuy, Inc.,* 140 F.3d 31, 39 (1st Cir.1998) (citing *Klax-*

on v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Accordingly, the Court looks to Massachusetts law to determine which state's law ought govern this dispute.

*Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662 (1985) (Wilkins, J.), forms the touchstone of contemporary choice-of-law analysis in Massachusetts. *See, e.g., Millipore Corp. v. Travelers Indem. Co.,* 115 F.3d 21, 30 (1st Cir.1997) (applying *Bushkin* ). *Bushkin* embraced the analysis articulated by the Restatement (Second) of the Conflict of Laws, *Bushkin,* 393 Mass. at 634, 473 N.E.2d 662, as part of a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Id.* at 631, 473 N.E.2d 662. Accordingly, this Court utilizes the analytic framework crafted in the Restatement.

Section 6(2) of the Restatement sets out a general conflicts analysis for all legal disputes, section 188 provides a generic contract analysis, and section 196 creates an analytic framework for personal services contracts in particular. *See* Restatement (Second) of Conflict of Laws §§ 6(2), 188, 196 (1971 & 2001 supp.) [hereinafter Restatement].

### 1. Section 196—Services Contracts

Section 196 addresses choice-of-law factors for personal services contracts—such as lawyers' contracts like the one here. *Id.* § 196. Section 196 states that the "law of the state where the contract requires that the services, or a major portion of the services, be rendered" ought apply, unless another state has a greater connection to

---

**2.** Ness Motley also suggested that Illinois, the state where the parties allegedly shook hands and agreed that Daynard would receive five percent of any fees won, should supply the governing law. Defs.' Mem. at 15–16. The Court rejected this argument at the September 13, 2001 hearing on the ground that it was "utterly fortuitous that the agreement, if there was an agreement ... took place in Illinois." Hr'g Tr. at 29–30.

the parties or the transaction under the principles set out in section 6(2). *Id.* In this instance, Daynard alleges that he was providing legal consulting services relating to the State Tobacco Litigation—litigation in the courts of Florida, Mississippi, Massachusetts, and other states. Compl. ¶¶ 41–42. He conducted research, analysis, drafting and the like in Massachusetts. Daynard Aff. ¶¶ 1–2 [Docket No. 33].

It is, of course, conceivable under different circumstances that a lawyer's services might be provided in a forum other than the one in which the lawyer's offices are located. For example, if a New York lawyer represented a client in a trial in New Jersey, the bulk of the lawyer's services would likely be rendered in New Jersey— even if the lawyer's office is in New York. Such circumstances do not present themselves here, however. Daynard is a consultant. The services he provided to Ness Motley included thinking, analyzing, strategizing, and researching, services which could be and were provided in Massachusetts. Daynard Aff. ¶¶ 1–2. In this context, Daynard rendered his services in Massachusetts.

Here, there is no genuine dispute about the fact that Daynard provided the vast bulk of his services to Ness Motley in Massachusetts. It is not clear that the contract *required* the services be performed in any particular location. The fact of the matter, however, is that the bulk of the services were provided in Massachusetts. No party has indicated that there was ever any consideration or discussion of Daynard permanently relocating to another state in order to render services. Whatever else can be said, all the parties knew Daynard was working in Massachusetts.

To be sure, Daynard's work product— briefs, memoranda and the like—was, according to Daynard, used in litigation in a number of states. *Id.* ¶ 2. Daynard's work product, however, was also utilized in litigation in Massachusetts. *Id.*[3] Thus, even if litigation in other states benefitted from Daynard's work product, the litigation in Massachusetts did as well. There is no indication in the record that Daynard performed substantially more work for litigation in other states than he did for Massachusetts litigation. The fact that Daynard's work product was used in other states, therefore, does not provide a reason, on this record, to disturb the conclusion that Daynard performed the lion's share of his obligation under the contract in Massachusetts. Absent a contrary indication in another section of the Restatement, therefore, Massachusetts law will govern the interpretation and enforceability of the alleged contract.[4]

---

**3.** Daynard does not seek to recover any portion of the defendants' fees attributable to the Massachusetts settlement, Compl. at 16 n. 1, as he apparently was compensated by another firm for his work relating to the Massachusetts settlement. This fact, however, does not alter the reality that Ness Motley participated in the Massachusetts litigation and that the expertise and work product Daynard provided was used just as much in Massachusetts as it was in other states. That Daynard is foregoing enforcement of part of his contract is immaterial to ascertaining the scope of the contract.

**4.** Daynard is providing his consulting services in Massachusetts, and is claiming a share of a legal fee. The Court notes, however, that Daynard is not licensed to practice law in Massachusetts. While the Court expresses no opinion on the significance, if any, of this fact, and the parties have not addressed it, the Court will forward a certified copy of this opinion to the Massachusetts Board of Bar Overseers so that it may consider whether Daynard's consulting services constitute the unauthorized practice of law in Massachusetts. *Compare, e.g., Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,* 17 Cal.4th 119, 70 Cal.Rptr.2d 304, 949 P.2d 1,

This case is much like *Sequa Corp. v. Lititech, Inc.,* 780 F.Supp. 1349 (D.Colo. 1992). In that case, Sequa retained Lititech to supervise and manage Sequa's defense against a number of products liability lawsuits pending in several states. *Id.* at 1351. In its retained capacity, Lititech advised Sequa on an overall litigation strategy, supervised local counsel in some cases, and acted as attorney of record in other cases. *Id.* The court in *Sequa* concluded that because the bulk of the services were provided in Lititech's offices in Colorado, Colorado law ought apply, despite the fact that much of the advice given and work product developed was for litigation in other states. *Id.* Likewise, here the fact that much of Daynard's work product was used in other states does not change the fact that he did most of his work under the contract in Massachusetts. Nevertheless, the Court will examine the other two relevant provisions of the Restatement to see if they counsel application of the law of a state other than Massachusetts.

## 2. Section 188—Generic Contract Choice–of–Law Provisions

Section 188(1) advises that in a contract case, a choice-of-law analysis be made using the general subject matter evaluation prescribed in section 6(2) and discussed below, *see infra* Part II.A.3. In addition, section 188(2) identifies five factors to consider when conducting a choice-of-law evaluation in a contractual context: (1) the place of negotiating; (2) the place of contracting; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, or place of business of the parties. "These contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement § 188(2).

■ Among these factors, the place of negotiating and place of contracting are the least significant. The Court sees little reason to apply different law to otherwise identical contracts because one was negotiated on a plane traveling over Arizona while the other was executed in an office in Chicago. Massachusetts has rejected the *lex loci* approach to determining choice of law. *E.g., Bushkin,* 393 Mass. at 630–32, 473 N.E.2d 662; *Choate, Hall & Stewart v. SCA Servs., Inc.,* 378 Mass. 535, 540–41, 392 N.E.2d 1045 (1979) (rejecting *lex loci* rule in dictum). Furthermore, here negotiations took place in multiple states and over the telephone. It is thus unclear where the contract was actually formed. Daynard alleges the negotiations took place in Massachusetts, Compl. ¶ 32, con-

10 (1998) (refusing to permit a New York law firm to collect legal fees for legal services performed in California where no attorney was admitted to the California bar), *and Peterson v. Anderson,* 155 Ariz. 108, 745 P.2d 166, 169–71 (1987) (refusing to enforce a fee-splitting agreement between an Arizona lawyer and an Illinois lawyer for legal services rendered in Arizona because the Illinois lawyer was not admitted to the Arizona bar, and hence could not practice law in Arizona), *with Dietrich Corp. v. King Res. Co.,* 596 F.2d 422, 425–27 (10th Cir.1979) (permitting law professor in Colorado who was not a member of the Colorado bar to share fees with Colorado law firm, because the services he provided to the Colorado firm did not constitute the "practice of law"), *and Freeman v. Mayer,* 95 F.3d 569, 574–76 (7th Cir.1996) (enforcing imperfect fee-splitting agreement between Illinois and Indiana attorneys); *see also* Restatement (Third) of Law Governing Lawyers § 3 cmt. e, reporter's note (1998) (criticizing *Birbrower*). Given the number of prestigious law schools in Massachusetts, the extensive and varied consulting arrangements entered into by individual faculty members at these schools, and the traditional interest of the Massachusetts Supreme Judicial Court in regulating the practice of law in this Commonwealth, the matter should be of some moment to the Board of Bar Overseers.

tinued in South Carolina, *id.* ¶ 33, and were supplemented in Illinois with a "price term" of five percent of the total fees awarded to Ness Motley and the dismissed defendants, *id.* ¶ 55–59. Therefore, even if the place of negotiating served as an important legal consideration in determining the law to be applied, which is not the case in Massachusetts, it would not be a very helpful consideration in this case. While it would foreclose New York and Mississippi law from applying, it would not help the Court determine which law among the other three contender forums ought apply.

In the Court's view, the dispositive factor in this case is the place of performance. Here, as previously discussed, Daynard was to provide services in Massachusetts. No matter where the parties were when they negotiated and concluded the contract, it must have been assumed that Daynard would work in Massachusetts. No one alleges that Ness Motley was going to relocate Daynard to South Carolina. To be sure, Daynard did provide location-specific work, even traveling to Mississippi to consult during Mississippi's tobacco liability trial. Compl. ¶ 60. Viewed in the context of the multi-year relationship between the parties, during which Daynard primarily provided his services from Massachusetts, such location-specific work is insufficient to dictate application of another state's law to this contract. Thus, Massachusetts is the clear choice with respect to the place-of-performance consideration.

The next consideration, the location of the subject matter of the contract, does not point the Court's decision away from Massachusetts. Were this a real estate action, for example, the subject matter of the contract might be the critical distinction from the analysis of the location of performance of the contract. Here, however, the subject matter of the contract is the performance of services. As previous-

ly discussed, the services were primarily provided in Massachusetts. Certainly the location of the subject matter of the contract also includes the states that were to benefit from Daynard's advice. The advice, however, was fungible. What benefitted one state benefitted another. It is difficult to assert that the contract as a whole had any particular location of the subject matter of the contract, aside from that of the place of performance. Accordingly, although these other states factor into the equation, this is not a reason to disturb the conclusion that Massachusetts law should apply.

Last, the domicile, residence, or place of business of the parties provides little assistance. Ness Motley is a South Carolina law firm; Daynard is a Massachusetts resident. This consideration does suggest that either South Carolina or Massachusetts ought supply the governing law, but it provides no basis to choose between these two states. It therefore does not tip the scale away from Massachusetts toward Mississippi or any other state.

In sum, the most significant factor under the Restatement section 188 analysis—the place of performance of the contract—points toward Massachusetts. The remaining factors point equally to multiple states, always including Massachusetts. Thus, the section 188 analysis fully supports the section 196 analysis—Massachusetts law ought govern this dispute.

### 3. Section 6(2) Analysis

Section 188(1) directs that the choice-of-law analysis in a contract dispute be made in light of the section 6(2) factors. Section 6(2) identifies seven relevant factors in a general choice-of-law analysis: (1) the needs of an interstate system; (2) the relevant policies of the forum; (3) the relevant policies of other interested forums; (4) the justified expectations of the parties; (5)

the basic foundational principles of the area of law at issue; (6) the uniformity and predictability of the result; and (7) the ease in determination and application. Restatement § 6(2).

The needs of a system of interstate commerce include flexibility, predictability, and certainty, as well as fairness of interpretation, in contracting. The interstate system requires the flexibility to negotiate transactions on the fly, without the risk that the law of an unintended forum law will govern, creating unexpected obligations for the parties. Whether a deal is struck while traveling in an airplane or while sitting in an office tower in Boston ought not determine the choice of law in a contract setting because the location of the execution of the contract might be completely fortuitous, and have no connection to the substance of the contract or the obligations of the parties. As previously noted, the Massachusetts Supreme Judicial Court has rejected the doctrine of *lex loci.* The court did so fully aware that rejecting such a single-factor approach might inject vagueness into choice-of-law determinations and, in a contract setting, make it more difficult for parties to anticipate ex ante which forum's law will apply and contract around the anticipated default forum if necessary. *Bushkin,* 393 Mass. at 631–32, 473 N.E.2d 662. Looking to the law of the place where services are to be provided, instead of the place where the contract was formed, better meets the needs of an interstate system because where the services are provided bears a closer relationship to the totality of the parties' expectations than does the merely fortuitous location of execution. Moreover, the place of performance is usually capable of ready ascertainment and therefore does not necessarily deprive the parties of the certainty, fairness, and predictability that they seek in forming a contract. The parties retain the option of selecting ex ante the law of a particular forum that will govern their relationship. Here, because the majority of services were provided in Massachusetts, it seems reasonable to conclude that the parties expected, or at least would not be surprised to learn, that Massachusetts law governs their relationship.

Section 6(2) also directs analysis of the relevant interests of the various states involved. New York has very little interest in this dispute. To be sure, Daynard is a member of the New York bar, but he did not work in New York, contract in New York, or otherwise have any contact with New York with respect to this dispute. Residents of both South Carolina and Mississippi arguably contracted with Daynard for the provision of legal services. Both states have an interest in regulating the provision of legal services to the extent that such services are rendered in South Carolina or Mississippi. Neither state has any interest in regulating, for example, a New York lawyer's services to clients in New York. Mississippi would have an interest in regulating a New York lawyer's services to a Mississippi client regarding a securities filing in Washington, D.C., albeit an attenuated one. Such representation takes place in a separate forum, not involving Mississippi law or courts. If a Mississippi resident hires a New York lawyer to do the Mississippian's legal work, then the Mississippian is protected by New York standards of professional responsibility. It is only once the New York lawyer renders services in Mississippi, and only to the extent such services are actually rendered in Mississippi, that Mississippi develops a significant interest in the regulation of legal services provided by the New York lawyer.

Each state has a strong interest in enforcing contracts and in protecting its consumers of legal services against predation

by attorneys. This is the principal policy interest of each of the contender forums that must be considered in this case. To the extent, therefore, that Daynard gave advice regarding particular litigation to states as prospective plaintiffs against the tobacco industry, each state that he advised has an interest in regulating the provision of legal services. Massachusetts, however, has an added interest in this case because the advice provided by Daynard was provided principally from within its borders.

Furthermore, application of Massachusetts law does not prevent any other state from disciplining attorneys who violate its rules. In other words, application of Massachusetts law to this contract claim does not prevent the courts of another state from disciplining attorneys subject to its authority who violate its ethical rules by entering into improper fee-splitting agreements. Here, Daynard allegedly contracted with attorneys from South Carolina and Mississippi, who were subject to regulation and sanction by the rules of professional responsibility of those states. Thus, application of Massachusetts law does not inhibit other states from protecting their citizens by regulating their attorneys.

Section 6(2) also counsels considering the ease of application of the law. In this case, the law is uncertain regardless of whether the law of Massachusetts is applied, *see infra* Part II.B, or the law of another state is applied. *See Daynard I,* 178 F.Supp.2d at 28. The case does not become significantly easier or more difficult to decide depending on which state provides the governing law—irrespective this Court must address a thorny issue of first impression. Accordingly, no forum is favored by the ease-of-application factor.

The last section 6(2) factor protects the justified expectations of the parties. The Court presumes that, if a contract was formed in this case (which is assumed to be true for purposes of summary judgment), the parties expected it to be enforced. According to Daynard, Ness Motley has already received the benefit of its bargain with Daynard, as Daynard provided advice, expertise, and other services that helped generate the gigantic settlement awards for the states against the tobacco companies. But Daynard, according to his view of the case, has not received the benefit of his bargain with Ness Motley.

Assuming that there is a contract, the Court ought select the law of a state that is most likely to enforce the contract. *See Bushkin,* 393 Mass. at 635–36, 473 N.E.2d 662 ("[W]e are inclined to resolve the choice [of law] by choosing that law which would carry out and validate the transaction in accordance with [the parties'] intention, in preference to a law that would tend to defeat it." (citation and internal quotation marks omitted)). As is discussed below, Massachusetts will permit recovery on the contract. Accordingly, whether other states would similarly permit recovery or not, Massachusetts is at least equally selected by the final section 6(2) factor.

Having considered all of the factors articulated by the Restatement and endorsed by Massachusetts courts for determining which state should supply the governing law in a legal dispute generally and a personal services contract specifically, the Court concludes that Massachusetts has a substantially greater interest in applying its laws to this dispute than any other state. Accordingly, the Court will apply Massachusetts law to this dispute.

## B. Imperfect Fee–Splitting Agreements

■ Having decided that Massachusetts contract law will govern the interpretation of the purported agreement, the Court

must determine whether Massachusetts would enforce an imperfect fee agreement. In determining that this is an imperfect fee-splitting agreement, the Court notes that Daynard may be subject only to the New York ethics requirements, given the fact that he is licensed to practice law only in New York. Accordingly, if Daynard had complied with New York's ethics requirements, the Court might have to determine whether Massachusetts would enforce a contract performed in Massachusetts which did not comply with Massachusetts ethical obligations, but did comply with the ethical obligation of another forum. Fortunately, such a thorny issue does not arise in this case, as the New York Code of Professional Responsibility is the same as the Massachusetts requirements in all respects relevant here. *Compare* N.Y.Code of Prof'l Responsibility DR 2–107(A), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.12 (1995 & Supp.2001), *with* Mass. Rules of Prof'l Conduct R. 1.5(e), Mass. S.J.C. Rule 3:07, 426 Mass. 1301, 1317–18 (1998).[5] A

violation of one ethical code in this case amounts to a violation of the other, so the Court will treat them as one and the same.

█ The Massachusetts and New York rules share three elements for a valid fee agreement: (1) disclosure of the fee agreement to the client; (2) consent by the client; and (3) reasonableness of the fee in its entirety. Mass. Rules of Prof'l Conduct R. 1.5(e); N.Y.Code of Prof'l Responsibility DR 2–107(A).[6] It appears undisputed that the parties failed to comply with these obligations, as they failed to notify their clients of the agreement between Ness Motley and Daynard and failed to obtain their clients' consent to such an agreement.[7] *See, e.g.,* Pl.'s Opp. at 2, 10–11. Accordingly, the critical issue here is whether Massachusetts courts will enforce a contract that violates these ethical regulations, and thus runs contrary to public policy or is illegal.[8]

█ Massachusetts decisions reveal an unmistakable reluctance to let a violation

---

**5.** The Massachusetts rule technically is more lenient than the New York rule, as the Massachusetts rule does not require either that the division of fees be in proportion to the services performed by each lawyer or that the lawyers provide the client with a writing in which each lawyer assumes joint responsibility for the representation. Mass. Rules of Prof'l Conduct R. 1.5 cmt. 4A, 426 Mass. at 1320–21. The corresponding New York rule requires that one of these requirements be met in order for a fee-splitting agreement to be valid. N.Y.Code of Prof'l Responsibility DR 2–107(A)(2), N.Y. Comp.Codes R. & Regs. tit. 22, § 1200.12(a)(2). The additional requirements of the New York rule are not relevant here, however, as the parties clearly have violated the other provisions of both rules.

**6.** As noted earlier, *see supra* note 5, the New York rule contains additional elements not required by the Massachusetts rule. Those additional elements do not change the fact that the parties have violated both rules.

**7.** The pleadings indicate that at least some clients potentially had knowledge of, and encouraged, Daynard's participation in the various suits. *E.g.,* Compl. ¶ 47 (alleging the General Counsel to the Governor of Florida directed outside counsel via letter to keep Daynard involved in the litigation). The Court expresses no opinion as to whether such allegations satisfy the requirements of whatever rules of ethics apply to the attorneys involved.

**8.** The terms "contrary to public policy" and "illegal" often are used interchangeably in published opinions. There is, however, a distinction between the two. The term "illegal" ought be limited to contracts the very making of which is prohibited—contracts for murder, for example. Conversely, "contrary to public policy" ought be used to refer to contracts which are not per se contrary to public policy, but the execution of which is so—such as imperfect fee-splitting agreements. *See, e.g., Daynard I,* 178 F.Supp.2d at 12–13 (discussing this distinction).

of public policy spoil entirely an otherwise valid agreement. Massachusetts courts rarely require complete forfeiture of the contract, sometimes allow recovery for the fair and reasonable value of the services rendered, and sometimes permit recovery on the contract in its entirety. *E.g., City of Lawrence v. Falzarano*, 380 Mass. 18, 23, 402 N.E.2d 1017 (1980) (enforcing contract where contractor failed to obtain statutorily-required certificate of need for renovation of public health facility); *Valley Stream Teachers Fed. Credit Union v. Comm'r of Banks*, 376 Mass. 845, 851–53, 384 N.E.2d 200 (1978) (enforcing bank's contract made where bank directors violated statute by failing to obtain approval of bank commissioner prior to entering contract); *Town Planning & Eng'g Assocs., Inc. v. Amesbury Specialty Co.*, 369 Mass. 737, 746–47, 342 N.E.2d 706 (1976) (enforcing agreement between unlicensed engineer and client even though unlicensed engineer violated statute requiring those performing engineering services to be licensed by the state, and suggesting that in cases where the violation of law was more egregious, recovery in quantum meruit ought still be allowed); *Buccella v. Schuster*, 340 Mass. 323, 326, 164 N.E.2d 141 (1960) (permitting recovery for blasting services where contractor failed to obtain bond or permit for blasting); *see also, Hastings Assocs., Inc. v. Local 369 Bldg. Fund, Inc.*, 42 Mass.App.Ct. 162, 175–77, 675 N.E.2d 403 (1997) (noting traditional aversion of Massachusetts courts to complete invalidation of contracts that violate public policy). The Court develops this theme in greater detail below.

### 1. Analytic Framework

In deciding whether to enforce contracts that contravene public policy, Massachusetts has developed a relatively sophisticated analytic technique. Consider, for example, the Supreme Judicial Court's opinion in *Town Planning & Engineering Associates, Inc. v. Amesbury Specialty Co.*, 369 Mass. 737, 342 N.E.2d 706 (1976), which involved an action by an engineering company for recovery on a contract. The defendant argued that the engineer was not licensed in Massachusetts, and thus the contract violated state law requiring a licensed professional engineer to oversee all engineering work. *Id.* at 742–44, 342 N.E.2d 706. Accordingly, the defendant argued that enforcement of the contract was contrary to public policy. *Id.* The court permitted recovery on the contract, however, as the plaintiff-engineer had retained licensed professional engineers at the behest of the defendant to perform all the "actual" engineering. *Id.* at 744–45, 342 N.E.2d 706. The court concluded that where the making of the contract itself was not illegal, but merely the manner of performance was illegal, recovery on the contract could be had at the discretion of the trial court. *Id.* at 747, 342 N.E.2d 706. In reaching its decision, the Supreme Judicial Court established a multi-factor analytic test to determine whether the "vector of considerations" point in favor of enforcing a contract that violates public policy. *Id.* at 745–46, 342 N.E.2d 706. The relevant factors include:

[T]he nature of the subject matter of the contract; . . . the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract (were 'the characteristics which gave the plaintiff's act its value to the defendant . . . the same as those which made it a violation . . . of law'); what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff,

how gross or undeserved the defendant's windfall.

*Id.* at 745–46, 342 N.E.2d 706 (footnotes omitted). Importantly, the court additionally observed that in cases involving more serious violations of public policy, the proper judicial response, beyond enforcing the law that was violated, would be to limit recovery to quantum meruit. *Id.* at 747, 342 N.E.2d 706. The court did not believe that this was such a case, however, and allowed the plaintiff full recovery on the contract. *Id.*

In *Harness Tracks Security, Inc. v. Bay State Raceway, Inc.,* 374 Mass. 362, 373 N.E.2d 353 (1978), the Supreme Judicial Court employed the analytic framework enunciated in *Town Planning.* In *Harness Tracks,* the plaintiff was a New York private detective company that entered into a contract for services in Massachusetts. *Id.* at 363–64, 373 N.E.2d 353. The defendant later repudiated the contract and defended against a breach of contract action on the ground that, because the plaintiff was not licensed in Massachusetts, the contract was illegal and thus unenforceable. *Id.* at 364–65, 373 N.E.2d 353. The Supreme Judicial Court permitted recovery on the contract for services performed, but denied contract damages for the executory portion of the contract, deeming that an adequate disincentive to violate the rule requiring private detectives working in Massachusetts to be licensed here. *Id.* at 367, 373 N.E.2d 353.

In *Joffe v. Wilson,* 381 Mass. 47, 407 N.E.2d 342 (1980), the plaintiff was a certified public accountant who had managed a tax appeal for the defendant-client. *Id.* at 47–50, 407 N.E.2d 342. After exhausting the administrative appeals that, as an accountant, the plaintiff was entitled to prosecute, the plaintiff hired a lawyer on behalf of the client to prosecute a district court action. *Id.* at 48–49, 407 N.E.2d 342. The plaintiff was not authorized to engage in the practice of law, but acted as an intermediary between the client and attorney. *Id.* at 52, 407 N.E.2d 342. The defendant used this fact to argue that the contract should be invalidated after the plaintiff sought enforcement of the contract between them. *Id.* The Superior Court, after applying the *Town Planning* framework, determined the accountant's conduct to be serious enough to warrant denial of recovery on the contract, *id.* at 55–56, 407 N.E.2d 342, but not so serious as to deny recovery in quantum meruit, *id.* The Supreme Judicial Court affirmed, permitting recovery for the fair and reasonable value of the services rendered. *Id.* Moreover, in determining the fair and reasonable value of the plaintiff's services, the court looked to the value the parties had contemplated at the time of contracting, thus equating the quantum meruit value of the accountant's services with that demonstrated by the contractual promises. *Id.*

Similarly, in *Business Brokers International Corp. v. Roderick,* 24 Mass.App.Ct. 957, 510 N.E.2d 301 (1987), a business broker was retained to sell a restaurant and its associated real estate. *Id.* at 957, 510 N.E.2d 301. One of the broker's agents was not a licensed real estate broker. *Id.* Massachusetts law prohibits the affiliation of an unlicensed real estate broker with a licensed broker, and the seller sought to use the broker's violation of this rule as a basis for avoiding payment of the commission due after the business was successfully sold. *Id.* The court found that the seller had repeatedly told the business broker he would pay a ten percent commission upon sale of the business, all the while intending to use the licensing violation to avoid paying the commission. *Id.* at 958, 510 N.E.2d 301. Under such circumstances, using the *Town Planning*

analysis and examining the equities of the case, the court enforced the contract. *Id.*

Finally, in *Kenyon v. Andrews*, 347 Mass. 769, 197 N.E.2d 879 (1964), the Supreme Judicial Court considered illegal contracting in the insurance context. One of two partners in an insurance firm failed to become a licensed insurance broker, as is required by law in Massachusetts. *Id.* at 769, 197 N.E.2d 879. Accordingly, the partners negotiated a termination agreement and the partnership was dissolved. *Id.* The licensed broker breached the termination agreement, and the unlicensed broker sued to enforce it. *Id.* The court concluded that the settlement agreement was enforceable on its terms, despite the fact that the underlying partnership was illegal. *Id.* Although the court did not rely on or articulate factors similar to those in *Town Planning*, the case supports the proposition that agreements that run counter to public policy by violating state law rules of professional certification do not necessarily become unenforceable as a result.

In short, the *Town Planning* approach is applied in a multitude of situations, and provides a flexible approach that usually allows some form of recovery when contracts violate public policy.

## 2. Attorney Agreements Against Public Policy

As one might expect, Massachusetts courts have imported the *Town Planning* factors into cases involving contracts with attorneys in which the attorneys have violated the rules of ethics that govern them. In *Young v. Southgate Development Corp.*, 379 Mass. 523, 399 N.E.2d 27 (1980), for example, the Supreme Judicial Court determined that an attorney was not entitled to collect on a contingent fee agreement that was never signed by the client. *Id.* at 524–25, 399 N.E.2d 27. In *Young*, the attorney notified the client in writing of the contingent fee, but failed to obtain the client's written consent to such a fee, as was required by the ethics rules then in force. *Id.* The court therefore declined to enforce the unexecuted agreement. In *Young*, however, the plaintiff-attorney had engaged in misconduct beyond merely failing to obtain the client's written consent to the fee agreement, as the attorney had continued trying to collect the fee after ascending to the bench as a juvenile court justice. *Id.* at 525–26, 399 N.E.2d 27. In spite of these episodes of misconduct, the court affirmed the Superior Court's judgment that the attorney's misconduct did not "warrant a forfeiture of his right to collect a fee based on the value of the services which he rendered prior to the time he became a judge." *Id.* at 526, 399 N.E.2d 27 (citing *Town Planning*, 369 Mass. at 746–47, 342 N.E.2d 706). The court thus allowed the attorney-turned-judge to recover the fair value of services rendered to the defendant-client.

In *Guenard v. Burke*, 387 Mass. 802, 443 N.E.2d 892 (1982), the Supreme Judicial Court refused to permit an attorney to collect on his contract—a contingent fee agreement in a divorce proceeding—but allowed the attorney to recover the reasonable value of his services under *Town Planning*. *Guenard*, 387 Mass. at 806–08, 443 N.E.2d 892. In doing so, the court found it important that "[r]epresentation of the client was not illegal [because of a conflict of interest, for example]; only the contingent fee was," and that denying recovery altogether would "relieve[ ] . . . [the client] of the obligation to pay any attorney's fee for the [attorney's] proper services." *Id.* at 808, 443 N.E.2d 892. The court also ruled that denying recovery of a contingent fee in a divorce proceeding while allowing recovery of reasonable fees sufficed to further the policy objectives of

the ban on contingency fees in divorce cases: "to encourage reconciliation by removing any incentive to the attorney to press forward with the divorce and, secondarily, to assure that the court will be able to make a fully informed equitable property settlement," *id.* at 806, 443 N.E.2d 892. *See id.* at 808, 443 N.E.2d 892.

In *Mulhern v. Roach*, 398 Mass. 18, 494 N.E.2d 1327 (1986), an attorney sought to recoup the reasonable value of his services to a client, which he argued was one-third of the client's total recovery. *Id.* at 22, 494 N.E.2d 1327. The attorney did not seek recovery on the contract; the dispute was limited to determining the reasonable and fair compensation due. *Id.* at 24, 494 N.E.2d 1327. Although the Supreme Judicial Court observed that a one-third contingency agreement would not be enforceable, as no such agreement was ever put in writing and signed by the parties, *id.*, the court did hold that such a defect in the fee agreement did not preclude the attorney from recovering the fair and reasonable value of services rendered, *id.* (citing *Guenard*, 387 Mass. at 806–08, 443 N.E.2d 892; and *Young*, 379 Mass. at 525–26, 399 N.E.2d 27). Interestingly, the court affirmed the Superior Court's determination that the attorney was entitled to $350,000 in fees, almost one-third of the client's $1,186,101 recovery. *Id.* at 23, 30–31, 399 N.E.2d 27. The result was therefore practically the same as if the court had allowed the plaintiff to recover on an unwritten, unsigned contingency fee agreement.

In *Bloomenthal v. Halstrom*, No. 951773B, 1999 WL 1318980 (Mass.Super. Mar. 16, 1999) (Burnes, J.), the Massachusetts Superior Court refused to enforce a fee-splitting or referral agreement between the plaintiff and defendant, both of whom were lawyers. *Id.* at *5. The court rejected recovery on the contract and in quantum meruit, not because of the fee-splitting agreement, but rather because the referring attorney had a conflict of interest—he represented the adverse party—and therefore could not have taken the case in the first place. *Id.* at *3–*4.

 Most of these cases apply the *Town Planning* analysis or cite cases that do. *Bloomenthal* did not, even though it was the only case that involved a fee-splitting agreement. In that case, however, the critical fact was that the plaintiff who was seeking to enforce the fee split was not entitled to any fee from that client because of a conflict of interest. The Supreme Judicial Court in *Guenard*, in allowing an attorney to recover the fair and reasonable value of his services despite his attempt to execute a contingency fee agreement in a divorce proceeding, found the absence of a conflict of interest or other factor rendering the representation itself illegal (rather than merely the fee), to be a reason to allow the attorney to recover a reasonable fee. *Guenard*, 387 Mass. at 808, 443 N.E.2d 892 (distinguishing *Misci v. Revere Housing Authority*, 359 Mass. 743, 744, 269 N.E.2d 210 (1971), which denied recovery of fee under a contract or quantum meruit theory where the attorney had a conflict of interest in representing the defendant-client, and *Collins v. Godfrey*, 324 Mass. 574, 581, 87 N.E.2d 838 (1949), which prohibited recovery by a lawyer-turned-judge of fees for legal advice given to the defendant-client in a criminal matter, where such advice violated a state rule that Massachusetts judges may not engage in criminal practice). Here, Ness Motley does not suggest that Daynard's involvement in the State Tobacco Litigation was *itself* illegal, but rather that the fee was illegal. There is thus no reason not to apply the *Town Planning* factors to determine whether the "vector of considerations" points in favor of enforcing the five

percent agreement, denying recovery of the five percent but allowing recovery in quantum meruit, or denying recovery altogether. Accordingly, the Court proceeds to analyze this dispute in light of the *Town Planning* factors.[9]

### 3. Application of *Town Planning*

Some of the *Town Planning* factors outlined above are relevant, some are not. The Court proceeds below to consider the contract in this case in light of those of the *Town Planning* factors that are particularly helpful in determining whether an imperfect fee-splitting agreement is nonetheless enforceable.

### a. Type of Contract, Extent of Illegality, and Relation to the Contract

The first set of factors concerns the nature of the contract and the extent of the illegal behavior. In this instance, the contract relates to legal services. This is not, however, the prototypical legal transaction between client and attorney. In this case, although the clients were technically the states, it is more accurate to say that the clients were some of the leading legal officers of the states, usually an attorney general or someone similarly situat-ed. Presumably these attorneys know a little bit about professional responsibility, and would be perfectly able to object in the event that they knew about and found disadvantageous the fee agreement between Daynard and Ness Motley. Moreover, Ness Motley hired Daynard to serve principally as a consultant to a set of attorneys representing a host of clients facing essentially the same legal problem. Although Daynard was acting as an attorney, and therefore subject to the rules of professional conduct, he was not acting directly as the states' attorney. Rather, he was acting as a consultant to Ness Motley and another firm. *See Dietrich Corp. v. King Res. Co.*, 596 F.2d 422, 425–27 (10th Cir. 1979) (holding that similar consulting services provided by a professor in a state other than the one in which he was licensed was not unethical because it did not amount to the "practice of law").

 The allegedly illegal behavior in this case is insubstantial. Fee-splitting agreements, subject to certain procedural requirements, are perfectly legal. There is no public policy against fee-splitting agreements per se. Thus, there is no per se bar against enforcing this agreement as there would be against enforcing, for example, a contingency fee agreement in a

---

**9.** In addition to prevailing under the *Town Planning* analysis, a party may prevail in its attempt to enforce a contract against public policy if the other party's conduct provides grounds for applying the doctrine of estoppel. *E.g., Turnpike Motors, Inc. v. Newbury Group, Inc.*, 403 Mass. 291, 296–97, 528 N.E.2d 1176 (1988) (barring defendants from arguing that contract for brokerage fee could not be enforced because plaintiff was not a licensed real estate broker, because defendants represented to plaintiff that the transaction was merely one for the sale of corporate stock, rather than real estate, and that the broker would not need a real estate license to complete the transaction).

The essential factors giving rise to an estoppel are ... (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission.

*Cleaveland v. Malden Sav. Bank*, 291 Mass. 295, 297–98, 197 N.E. 14 (1935) (citation and internal quotation marks omitted). The parties have not addressed this issue, however, so the Court does not consider whether the facts warrant rejecting Ness Motley's illegality argument on estoppel grounds.

divorce or criminal matter. *Compare* Mass. Rules of Prof'l Conduct R. 1.5(e), 426 Mass. at 1317–18 (regulating, but not barring, fee-splitting agreements generally), *with id.* R. 1.4, 426 Mass. at 1317 (barring all contingency fee agreements in domestic relations and criminal matters). In essence, Daynard and Ness Motley neglected to inform the clients—the states—that they had entered into a fee-splitting agreement. In the context of this case, however, this seems less egregious than the more typical hidden fee-splitting agreement that led to the development of the rule. The sheer mechanics of notifying clients was somewhat impractical—there were multiple states, multiple firms involved, and multiple consultants. The prospects for recovery were slim, the payment date unknown. The states would likely have encouraged the lawyers to enlist all the help they could get, from lawyers and non-lawyers alike. Furthermore, this was not a "secret" fee-splitting agreement: Daynard's presence was known to at least some states, and not concealed. *See, e.g.,* Compl. ¶ 47 (discussing General Counsel to the Governor of Florida's request that Daynard stay involved in Florida's litigation).

Lastly, the behavior giving rise to the contravention of public policy—the failure to obtain adequate consent to the fee-splitting agreement—was purely incidental to the contract. There was no material breach—by either party—through their failure to obtain client consent. In other words, this was a contract to provide consulting on the State Tobacco Litigation, not a contract to obtain client consent. The purpose of the contract was not the cause of the contravention of public policy.

### b. Strength of the Public Policy Prohibition, and the Extent of Undermining Enforcement

 The public policy prohibition against fee splitting is rooted in several concerns about the relationship between the public and the legal profession. First, fee splitting is similar to referrals—which the law generally disfavors, because fees reaped by lawyers ought reflect the actual honest work done by those lawyers. Second, fee-splitting potentially exposes client confidences to parties with whom the client has no confidential professional relationship. Such parties would not be bound, as lawyers are, to preserve the confidentiality of the client's communications. Third, fee-splitting potentially creates a situation in which there is a distance between the real client and the fee-splitting attorney, thus muddling the duty of loyalty owed by the fee-splitting attorney to the client. In other words, if the fee-splitting attorney, by virtue of the arrangement with other lawyers, has little or no contact with the client, she or he might not be well-situated to understand and fight for the client's best interests. Ultimately, the rules of professional responsibility are intended to promote public respect for and confidence in the legal profession, and insofar as fee-splitting agreements jeopardize such respect and confidence, the rules of professional responsibility regulate them. *See, e.g., Bond v. Crill,* 906 S.W.2d 103, 106 (Tex.App.1995); *King v. Housel,* 52 Ohio St.3d 228, 556 N.E.2d 501 (1990); Restatement 3d of the Law Governing Lawyers, § 47, cmt. e.

Turning to the instant case, several factual issues must be addressed. First, the ultimate source of the attorneys' fees is immaterial. As the tobacco litigation ultimately settled, the attorneys' fees could arguably be characterized as paid from a fund separate from the state settlements. This does not change the ethical obligations of the parties. There is no reason to believe that the money set aside for attorneys' fees did not diminish the

amount available for settlement with the states. Even if it did not, at the time the agreement was made, there was no knowledge of how the attorneys' fee payments would be made. This Court will not permit an *ex post* development to cure an *ex ante* violation.

Second, this case does not implicate referral fees or any of the concerns associated with referral fees. Daynard worked on these cases for at least a decade. He provided valuable services to Ness Motley and others, including advice and strategic consultation. Daynard is nothing like the plaintiffs in many cases who are denied enforcement of their "fee-splitting" contracts, which are in reality fee-referral contracts. *See, e.g., Holstein v. Grossman,* 246 Ill.App.3d 719, 186 Ill.Dec. 592, 616 N.E.2d 1224, 1229 (1993) (holding that a "fee-sharing agreement which is primarily based on a client referral is unenforceable as a matter of public policy where the undisputed facts show that the referred client never consented in writing to the attorneys' arrangement"). There is thus no concern in this case about Daynard taking home more than he is due, as there is no indication here that his services are not proportional to the alleged contract amount—five percent.

Third, while fee-splitting agreements are disfavored as impairing client confidences by arguably permitting unauthorized disclosure of confidential information, that concern does not figure prominently in this instance. As a practical matter, other than data regarding damages, the states and their attorneys possessed little historical data and, while Daynard surely had access to privileged material, his apparent focus was on legal analysis, the development of theories of liability, and litigation strategy. This is not the situation where the client had secrets it wished to keep—to the contrary, the opponents had the se-crets. The medical and scientific research connecting smoking with adverse health effects, data regarding public funds expended treating patients, are all public information. There is nothing in the record to indicate, and common sense suggests, that there were no client confidences of the type contemplated in the prototypical relationship.

Lastly, there is no indication that client loyalties were ever jeopardized in this case. This is not a situation where the integrity of the bar or the public perception of lawyers would be diminished by enforcement of the contract. There has been no misconduct by attorneys in the form of taking advantage of uninformed clients. On September 13, 2001, this Court ordered the defendants to notify their clients in the State Tobacco Litigation of Daynard's claim so that, if disposed, the clients could object and seek recovery of fees. To date none has objected. Apparently no client deems itself to be injured.

Accordingly, the public policy concerns inherent in the regulation of fee-splitting agreements are not significantly undermined through enforcement of this contract.

### c. Extent of Windfall or Forfeiture

The putative contract called for Daynard to receive five percent of the tobacco fees recovered. Ness Motley allegedly received its share of approximately $2,000,000,000.00. Daynard's five percent share, therefore, amounts to approximately $100,000,000.00. The Court recognizes that these are all face values, not discounted to present value. Nevertheless, this is a huge amount of money, and failing to enforce an otherwise valid contract worth this much money would represent a substantial forfeiture. From Ness Motley's perspective, this is a significant portion of

**132**

its legal fees. From Daynard's perspective, this is an even more significant portion of his likely income stream over the course of his life. The extent of forfeiture would be huge. As for a windfall, assuming that the parties did in fact enter into such an agreement, there would appear to be no windfall at all, as there is no evidence that Daynard's cut of the attorneys' fees, properly discounted, represent anything other than the value of the services Daynard provided to Ness Motley under the terms of their agreement. The only potential windfall in this case would be the windfall that Ness Motley would gain from not having to pay Daynard's fee if it were allowed to interpose this ethical violation that it, as well as Daynard, perpetrated, as a defense to a breach of contract.

#### d. Enforceability

The bottom line is that Daynard alleges that he and Ness Motley entered into a contract. Having taken advantage of Daynard's expertise, and collected their fees, Ness Motley now seeks to claim that the contract ought not be enforced. This smacks of injustice. Ness Motley reaped the benefits of an illegal contract it willingly entered into, yet paid no price for it.

In view of the foregoing analysis, the "vector of considerations" points solidly in Daynard's favor, so solidly that mere recovery in quantum meruit is insufficient. Recovery on the contract should remain on the table, subject, of course, to Daynard's ability to prove at trial that such agreement actually existed. The Court therefore denies Ness Motley's motion insofar as it seeks to void the contract between them and Daynard on public policy grounds.

### III. Conclusion

After applying Massachusetts' choice-of-law analysis, the Court rules that Massa-

chusetts law is the appropriate law to govern this dispute. The services were primarily rendered in Massachusetts, and the multiple competing forums all have lesser interests in the dispute than that of Massachusetts.

Massachusetts law dictates application of a multi-factor analysis to determine the enforceability of contracts made in contravention of public policy. On application of this analysis to these facts, the "vector of considerations" points toward enforcing the alleged contract on its own terms. Accordingly, Ness Motley's motion for summary judgment is DENIED.