FREDA JOFFE, individually and as executrix, *vs.*
SAUL WILSON
(and a companion case[1]).

Hampden. March 5, 1980. — July 1, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Accountant. Attorney at Law. Contract,* Validity. *Public Policy.*

Where a certified public accountant was hired by the plaintiff to proceed
  in attempting to settle a disputed deficiency assessment with the Inter-
  nal Revenue Service and subsequently entered into a contingent ar-
  rangement with the plaintiff whereby he retained an attorney to bring
  an action on the plaintiff's behalf with the understanding that the ac-
  countant would be entitled to 25% of any saving that came about as
  the result of the suit, the accountant was entitled to recover the
  reasonable value of his services even though the agreement offended
  the policy against intermediation subsumed by the general terms of
  Canon 5 of S.J.C. Rule 3:22, 359 Mass. 814 (1972) [51-55]; in the cir-
  cumstances, a finding that the accountant was entitled to 25% of the
  saving actually realized was not unreasonable [55-56].

CIVIL ACTIONS commenced in the Superior Court on May
14, 1976, and June 28, 1978.

The cases were consolidated for trial, and were tried
before *Moriarty, J.*

After review was sought in the Appeals Court the Supreme
Judicial Court, on its own initiative, ordered direct appel-
late review.

*Donald P. Conway* for Freda Joffe.

*Patricia A. Bobba* for Saul Wilson.

KAPLAN, J. In 1965 the plaintiff Freda Joffe and her hus-
band John J. Joffe incorporated under the name Joffe Oil
Co., Inc., an oil business which they had owned and oper-
ated as individuals. A rather intricate tax problem arose

---

[1] Saul Wilson *vs.* Joffe Oil Co., Inc.

from the assumption by the corporation of liabilities of the individuals. On December 12, 1967, the Internal Revenue Service (IRS) assessed a deficiency of $83,399.70 against them on their joint income tax return for the tax year 1965. The public (not "certified") accountant who represented them, feeling beyond his depth, asked Saul Wilson, defendant in the main action, a certified public accountant, to look into the case. Wilson had experience in tax matters and in negotiating for clients with the IRS. He concluded that the deficiency assessment was according to the letter of the code, but that it was inequitable, and he thought there was a chance the authorities could be induced to settle on a basis favorable to the taxpayers. Wilson had a talk with John Joffe and in early 1968 Freda and John gave Wilson a power of attorney to proceed on their behalf with the IRS. No arrangement was made at this time about a fee.

Wilson, after conferring unsuccessfully with a conferee in the IRS office in Springfield, took an administrative appeal to the Appellate Division of the IRS in Boston. He prepared himself with care on the facts and the law, and appeared in Boston perhaps four times to press the case. The Division did not yield, and in late 1969 a "ninety-day letter" issued. Wilson advised the son Herbert Joffe, who was acting for the family (John having died), to continue the struggle by bringing an action in the United States District Court, but he pointed out that this would mean retaining an attorney to handle the action and also paying in, provisionally, a substantial part of the assessment. Herbert was willing to have the lawsuit go forward, but he did not want to incur any substantial additional expense, especially as the prospects of success did not appear bright.

Accordingly, a contingent arrangement was made, embodied in Wilson's letter to Herbert dated March 19, 1970. Wilson was to be paid $1,000, stated to be "payment for all expense and services that have been performed to date"; and there was to be no charge "for any further expenses or any services performed by me or others," except that Wilson would be entitled to 25% of any saving that came about,

that is, "25% of the difference between $83,399.70 (1965) deficiency plus interest and the amount that is finally determined as due, plus interest . . . ."

Wilson had had earlier professional dealings with Mr. Irving D. Labovitz, an associate of a law firm in Springfield, and he went to that firm to handle the contemplated action. The record does not indicate that any definite arrangement was then made about a fee for the firm. After payment-in, action was brought in the United States District Court for Massachusetts in November, 1970, and trial occurred in October, 1972. Wilson worked cooperatively with Labovitz. He supplied the attorney with the substance of the material used in the Appellate Division and helped him to organize the facts. Wilson testified as an expert witness for the plaintiff at the trial which was attended also by Herbert Joffe. The judge held for the government in January, 1973.

Then arose the question of appealing to the Court of Appeals. Herbert was consulted and agreed to the appeal. It was taken in March, 1973, and a brief was prepared, with Wilson reading and criticizing Labovitz's draft. Around this time it appears Wilson came upon a recent decision supporting the result he had been urging. Negotiations with the government were resumed, evidently by Labovitz, with the happy result that the deficiency assessment was completely withdrawn, and by October, 1973, a government check was in hand for the amount paid in with accumulations.

At a meeting attended by Herbert and Freda the check was indorsed to Wilson, and Wilson returned his check in lesser amount with a receipt by him dated October 25, 1973, noting payment in full for accounting and legal services. Wilson's fee was $38,022, one-third of the savings calculated as $114,070. He paid the law firm a fee of about $6,500.

The increase of Wilson's contingent fee from a fourth to a third of the savings was explained by him in his testimony in the present case as being in accordance with an oral agreement made with Herbert at the time it was decided to take

an appeal to the Court of Appeals, and reflecting, according
to Wilson, the added work involved in a matter that had al-
ready run some five years. Herbert, however, denied that
there was such an agreement, and this difference presuma-
bly led to the present action. Herbert wrote to Wilson on
November 29, 1974, referring to and insisting on the terms
of the agreement of March 19, 1970. Wilson insisted on the
one-third and laid claim to additional fees of $7,500 —
$2,500 for accounting services for the plaintiff in 1972, and
$2,500 each for savings in State income tax and inheritance
tax consequent upon the settlement of the Federal income
tax assessment. He also claimed a fee of $2,500 for separate
work he had lately done for Joffe Oil Co., Inc.

This brings us to the present action by Freda, individually
and as executrix of John's estate. She sought to rescind the
fee agreement with Wilson on grounds of illegality — that
as a nonlawyer he had engaged in the practice of law[2] —
and to recapture the $38,022 paid to him. Wilson denied
that liability and counterclaimed for the $7,500 mentioned.
In a separate action Wilson sued the Joffe corporation for
$2,500. The actions were consolidated for trial to a jury.

For Freda and the corporation, there was testimony by
Freda and Herbert; for Wilson, testimony by him, Labo-
vitz, and Joseph Kalicka, a member of the Massachusetts
Board of Public Accountants. A special verdict was taken.
The question of illegality was reserved for the judge. He
put to the jury the questions whether the parties agreed to
modify the March 19, 1970, contract by increasing the
amount of the contingent fee from a fourth to a third (the
jury's answer was No); what was the reasonable value of
Wilson's services regarding the assessment up to March 19,
1970 (answer: $1,000); what was the fair value of all his

---

[2] So the judge viewed the theory of the action. The complaint alleged
that "defendant [Wilson] is not licensed to practice law, and therefore,
was not the causative agent for securing a recovery from the Internal
Revenue Service, and at best, can only recover charges for services on a
quantum meruit basis." The complaint, however, demanded judgment
for the entire $38,000.

services regarding the assessment (answer: $29,517.50). The latter figure may be taken to represent $1,000 plus one-fourth of the savings of $114,070. Thus the plaintiff secured a judgment of $9,504.50. (Of the counterclaims only one — about inheritance tax — survived to be put to the jury who found for the plaintiff. The jury found for Wilson for $1,000 on his separate claim against the corporation. These matters need not be further considered here.) [3]

After receiving the special verdict, the judge wrote an analytic memorandum summarizing the facts on the lines set out above. He concluded that there was illegality in the sense that Wilson had interposed himself between the client Herbert (acting for Freda) and the attorney Labovitz, but that, in the total situation, Wilson should not be deprived of the reasonable value of his services; and the judge accepted the jury's verdict as to the amount, which tallied with the original contingent agreement. Freda appeals, claiming the balance of the $38,022. Wilson has a cross appeal but it cannot succeed. [4]

The issues to be discussed are how to characterize or appreciate Wilson's activities in respect to the assessment and what consequences may follow.

There was nothing unlawful or questionable about Wilson's work as an advocate and negotiator through the Appellate Division, including not only the element of auditing involved but also the work of analyzing the statute and decided cases, and then arguing the matter on both phases. Wilson was entitled to and did "practice before the Internal Revenue Service" pursuant to Treasury Department Circular No. 230 (revised through 1966). [5] When the time

---

[3] We find no appeal claimed by Wilson from the adverse judgment on his counterclaims. Judgment in the separate action was entered on motion of both parties.

[4] Wilson's cross appeal would seek to reinstate an agreement for a one-third contingent fee despite the jury's finding; alternatively, to allow him a credit against the judgment of $9,504.50 of the $6,500 paid to the law firm.

[5] For the definition of the quoted words see Treasury Dep't Circ. No. 230, § 10.2 (a), and for the authority of certified public accountants to

came to commence an action in the District Court, Wilson acknowledged that he was not qualified to appear, and that an attorney must be retained to handle the proceedings. This was also understood by Herbert Joffe. In the actual cooperative work of Wilson, as accountant, and Labovitz, as lawyer, there was no irregularity. It was right, and useful, for Wilson to impart to Labovitz what he had gathered in his previous representation. It was for Labovitz to use this material to enhance his preparations for trial and then for appeal. He properly put Wilson forward as an expert witness. It is certainly possible for an accountant to offend by taking on the distinctive role of lawyer, but that did not occur here.[6]

We agree with the judge, however, that in another aspect there was a relationship here against the policy of the law. This lay in the fact that the client took no part in selecting the attorney who would conduct the litigation, the choice being made by Wilson, and that the usual direct personal connection did not exist between client and attorney. Wilson was an "intermediary" and the law firm presumably looked to Wilson for its fee, although that may have been understood as emanating from the savings to the client.[7]

---

practice, § 10.3(b). The plaintiff does not suggest that a State could choose to regard practice by certified public accountants before the IRS within Treasury Dep't Circ. No. 230 as illicit practice of law so far as carried out within the State, and prohibit it as such. See *Sperry* v. *Florida*, 373 U.S. 379, 399-400 & n.43 (1963). Cf. *Lowell Bar Ass'n* v. *Loeb*, 315 Mass. 176, 184-185 (1943).

[6] As to the interrelated functions of accountants and lawyers, see *Lowell Bar Ass'n* v. *Loeb, supra* at 182-183; and, at 56 A.B.A.J. 776 (1970), the statement of the National Conference of Lawyers and Certified Public Accountants, published jointly by the American Institute of Certified Public Accountants and the American Bar Association, to which is annexed a "Statement of Principles Relating to Practice in the Field of Federal Income Taxation," promulgated in 1951 by the National Conference.

[7] If the March 19, 1970, letter is compared with a standard contingent-fee agreement between attorney and client as set out in S.J.C. Rule 3:14, 351 Mass. 795 (1967), it differs in that it fixes a 25% contingent fee rather than a reasonable fee not to exceed a percentage, and it does not state that the client will pay legal expenses and costs.

A policy against intermediation is subsumed by the general terms of Canon 5 of S.J.C. Rule 3:22, 359 Mass. 814 (1972), Canons of Ethics and Disciplinary Rules Regulating the Practice of Law: "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." This indicates that the lawyer should be free of direction by a third person.[8] In our decided cases, the problem has arisen typically in the context of an organization furnishing some service to subscribers for a price — say road service to motorists, or collection service to members of an industry, or service in preparing tax returns — to which is added the making available to subscribers of attorneys, if needed, in connection with that service — say to defend the motorists in court in certain events, or to bring suit for the companies on unpaid accounts, or to carry through tax litigation. See *In re Maclub of America, Inc.*, 295 Mass. 45 (1936); *In re Shoe Mfrs. Protective Ass'n*, 295 Mass. 369 (1936); *In re Thibodeau*, 295 Mass. 374 (1936); *In re Lyon*, 301 Mass. 30 (1938); *Lowell Bar Ass'n* v. *Loeb*, 315 Mass. 176 (1943). See also *Opinion of the Justices*, 289 Mass. 607 (1935); Annot., Operations of Collection Agency as Unauthorized Practice of Law, 27 A.L.R.3d 1152 (1969). These organizations have been held to be engaged in the "purchase and sale of legal services" (*Maclub, supra* at 50) and thus illegally practicing law[9] where the control of the attorneys rested with the organizations rather than with the subscribers who were the true clients (as in *Maclub, Shoe Mfrs., Lyon, Lowell Bar Ass'n*). There was no irregularity where, despite payment by the organization, the ultimate control lay with the sub-

---

[8] Disciplinary Rule 5-107, "Avoiding Influence by Others than the Client," states: "(A) Except with the consent of his client after full disclosure, a lawyer shall not: (1) Accept compensation for his legal services from one other than his client," and "(B) A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services." See also Ethical Considerations EC 5-21 to 5-24 appearing in the ABA Code of Professional Responsibility, as amended August, 1976.

[9] In none of the cited cases was any criminal sanction sought. See G. L. c. 221, § 46B (jurisdiction to restrain violations of relevant statutes).

scribers (*Thibodeau*). See also ABA Opinions on Professional Ethics, No. 294, June 21, 1958. The propriety of particular arrangements may be a matter of degree. We should add that a concern with the intermediary problem is manifest in the recent legislation regarding "legal services plans." See G. L. c. 176H, § 2 (insured "indemnity" and "service" plans).[10]

Although there was intermediation in the situation at bar, the vice was not extreme. This was a single transaction, not a holding out to numerous persons. Here was not an offer by a layman to provide miscellaneous future legal services as part of a merchandising package, but a specific retainer of a lawyer for the purpose of taking a matter to court after efforts by another professional on the administrative level were exhausted. The client was a man of business, fully informed and agreeing — and very willing not to involve himself and to let the accountant see to the arrangements. While a direct relationship between attorney and client would have been desirable, consultation with the client did not have the usual importance because the facts and the issue were technical. In the event, there was no need to consult the client about the acceptability of the settlement because the recovery was complete. The interests of the accountant did not diverge from those of the client. The judge noted, incidentally, that the settlement was won, in the end, on the administrative, not the court level, and on that level the accountant was competent to practice.[11]

---

[10] The issue is how far the individual in any "group" plan is to be assured access to an attorney of his own choice. We express no opinion on any phase of the problem. See Morgan, The Evolving Concept of Professional Responsibility, 90 Harv. L. Rev. 702, 724 (1977).

[11] It may be observed also that appeal from the Appellate Division might have been taken to the United States Tax Court instead of the District Court. Practice in the Tax Court has not been limited to lawyers; others could qualify by taking examinations. See Rules of the Tax Court, Rule 2, as amended through September 1, 1965.

The effect of the testimony of the witness Kalicka was that the arrangement made by Wilson did not offend the ethical standards applicable to accountants, although it would have been preferable for Wilson to have recommended one or more attorneys to the client, and left it to the client to make the choice.

In these circumstances, the judge below had to decide whether Wilson should forfeit compensation for services rendered, with the plaintiff correspondingly gaining a windfall. He answered that question in the negative, relying in part on *Town Planning & Eng'r Assocs.* v. *Amesbury Specialty Co.*, 369 Mass. 737 (1976), where, after weighing the particular facts, we allowed a recovery for engineering work in accordance with the terms of the contract, although it was assumed that the person in charge had not been registered as an engineer and there was thus a violation of a criminal statute.[12] The decision followed from a consideration of "all the circumstances": "what was the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract (were 'the characteristics which gave the plaintiff's act its value to the defendant . . . the same as those which made it a violation . . . of law'); what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall." *Id.* at 745-746 (footnotes omitted). See *Lawrence* v. *Falzarano*, 380 Mass. 18, 23 (1980); *Harness Tracks Security, Inc.* v. *Bay State Raceway, Inc.*, 374 Mass. 362, 366-367 (1978); *Cameron* v. *Gunstock Acres, Inc.*, 370 Mass. 378, 381 (1976). See also 6A A. Corbin, Contracts § 1512, at 713 (1962). Cf. *Green* v. *Richmond*, 369 Mass. 47, 52 (1975).

The judge in the present case, considering the illegality serious, but not so serious as to forfeit recovery, thought Wilson's compensation should be on the basis of reasonable value (see *Town Planning, supra* at 747, and note 2, *supra*). The jury fixed that value, not unreasonably, in the terms

---

[12] In the present case the judge ruled correctly that there was no violation of a criminal statute, G. L. c. 221, § 41, regarding the unauthorized practice of law.

originally thought suitable by the parties themselves, and the judge accepted the result.

We, too, accept the result, and find added support for it in the reconsideration of the subject of "Unenforceability [of promises] on Grounds of Public Policy" which appears in Restatement (Second) of Contracts c. 14 (Tent. Draft No. 12, 1977). See especially §§ 320, 323, and 340, dealing with general considerations, licensing and similar cases, and restitution where a promise is held unenforceable. A "balancing" approach is adopted in determining whether a promise in particular circumstances shall be found unenforceable; where a promise is so found, there is no claim to restitution (reasonable value) unless denial would cause disproportionate forfeiture.[13] We venture to say that under the systematics of c. 14 the present promise to pay would be found enforceable, but if the contrary were found, the Restatement would be sympathetic to restitution.

*Judgments affirmed.*

---

[13] Thus the separate provisions of the first Restatement as to "champerty" (§§ 542[1], 545) are eliminated and the question is remitted to the considerations set forth as to enforceability and restitution. Cf. *Sullivan* v. *Goulette*, 344 Mass. 307, 312 (1962); *McInerney* v. *Massasoit Greyhound Ass'n*, 359 Mass. 339, 348-350 (1971); *Pupecki* v. *James Madison Corp.*, 376 Mass. 212, 219-220 (1978).