Gants, Ralph D., J.
The plaintiffs, Dr. Peter Palmer and his wife, Alison Palmer (“the Palmers”), have filed suit alleging that the defendants, including Ernst & Young LLP (“Ernst & Young”), provided negligent advice that caused the Palmers to enter into a tax saving plan that ultimately failed to accomplish its purpose. They claim that the defendants’ negligence caused them to suffer damages in excess of $9 million. The defendants have filed this motion for partial summary judgment contending that their liability is limited to £1 million because of a limitation of liability provision contained in an Engagement Letter agreement signed by Dr. Palmer on February 19, 1996. After hearing, this Court ALLOWS the defendants’ motion for summary judgment and declares that the defendants’ liability in this action is limited to £1 million, including interest and costs.
BACKGROUND
The facts relevant to this motion are not in dispute. In January or February 1996, Lee Williams of Ernst & Young spoke with Dr. Palmer about a tax saving plan that would defer the payment of taxes by transferring Dr. Palmer’s 23 percent shareholding in Axon Networks, Inc. (“Axon”) to a. discretionary family trust in Jersey in exchange for a private annuity (“the Annuity Transaction”). Dr. Palmer at the time was the Chief Executive Officer of Axon. Williams explained to Dr. Palmer that he worked for Ernst & Young in Jersey, but was a United States citizen and trained as an attorney in the United States. Williams, in fact, was a member in good standing of the Bar in one of our fifty states, but was not authorized to practice law in Massachusetts.
On February 19, 1996, Dr. Palmer met with Williams and two other Ernst & Young partners (Bob Allen and Bob Coplan) at Ernst & Young’s office in Boston to review and conclude the proposed Annuity Transaction. Allen was a tax partner, while Coplan was a tax planning specialist, and Dr. Palmer understood that *278 they, along with Williams, were providing advice as a team.
At this meeting, they presented Dr. Palmer with an Engagement Letter that discussed the proposed Annuity Plan in substantial detail. The Engagement Letter characterized the Annuity Transaction as “aggressive planning,” and discussed various Revenue Rulings, federal court cases, and proposed Internal Revenue Service (“IRS”) regulations that examined comparable Annuity Transactions. While recognizing that the legality of the proposed Annuity Transaction had not been established, the Engagement Letter declared, “Even if challenged by the IRS within the six year statute of limitations, we believe this planning may be defended based on the above public rulings, Ninth Circuit decisions, and the theory underlying the Tax Court’s decision in Shapiro." Engagement Letter at 5. The last paragraph of the Engagement Letter set forth a limitation of liability provision, in the same font as the balance of the letter:
The liability of Ernst & Young (including its partners, staff and associated entities), in respect of breach of contract or breach of duty; fault of [sic] negligence or otherwise whatsoever arising out of or in connection with this engagement shall be limited to £1,000,000 (including interest and costs) unless otherwise agreed in writing. This provision shall have no applicability to any liability for death or personal injury, any liability for which exclusion or restriction is prohibited by law, or to liability arising as a result of fraud on the part of Ernst & Young.
Id. The Engagement Letter, which was not written on letterhead stationery, was signed by Williams. On the first page were written the words, in bold and all capital letters:
PRIVATE AND CONFIDENTIAL
PRIVILEGED OPINION AND ADVICE OF COUNSEL
Id. at 1. Just before the limitation of liability provision, the Engagement Letter declared:
If the terms of this letter with respect to these proposals are acceptable to you, this letter will serve as our engagement letter and we will proceed to establish and implement the above planning upon your signing and returning to us a copy of this letter.
Id. On the final page, next to the word, “Agreed,” Dr. Palmer signed the Engagement Letter. Before signing, he did not attempt to negotiate its language or confer with independent counsel.
For purposes of this motion, this Court need not discuss how the IRS ultimately regarded this Annuity Transaction and how it played it out for Dr. Palmer. Suffice it to say that Dr. Palmer was not pleased with the outcome and seeks more than $9 million in damages for what he contends to be Ernst & Young’s negligence with regard to their planning and implementation of this Annuity Transaction.
DISCUSSION
“A party may, by agreement, allocate risk and exempt itself from liability that it might subsequently incur as a result of its own negligence.” Sharon v. City of Newton, 437 Mass. 99, 105 (2002). “There can be no doubt. . . that under the law of Massachusetts . . . in the absence of fraud a person may make a valid contract exempting himself from any liability to another which he may in the future incur as a result of his negligence or that of his agents or employees acting on his behalf." Id., quoting Schell v. Ford, 270 F.2d 384, 386 (1st Cir. 1959).
Here, the Engagement Letter agreement did not exempt Ernst & Young from liability, but merely limited its liability. The limitation of liability was clearly stated at the close of the letter, just below the paragraph informing Dr. Palmer that the Engagement Letter set forth the terms of the engagement if the terms were acceptable to him. The limitation of liability was in the same font as the rest of the letter; it was not buried in small print. There is no allegation that Ernst & Young made any fraudulent misrepresentations or otherwise fraudulently induced Dr. Palmer to agree to the terms of the Engagement Letter.
Nor can there be any reasonable contention that the limitation of liability provision was unconscionable and therefore unenforceable, either because of its substantive terms or the imbalance in bargaining power or the naivete of Dr. Palmer. See Waters v. Min Ltd, 412 Mass. 64, 68 (1992) (“Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and not to allocation of risk because of ‘superior bargaining power’ ”), quoting Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 292-93 (1980). The liability, even when limited, was considerable — £1 million. If the 1 million had been in United States dollars rather than British pounds, it would still have been more than 22 times greater than the $45,000 that Ernst & Young charged Dr. Palmer as its fee to establish and execute the Annuity Transaction. Since the British pound in 1996 was worth at least fifty percent more than a United States dollar, the actual ratio of potential liability to fees charged is even greater than 22. Dr. Palmer, although not trained as a lawyer, was the Chief Executive Officer of Axon and has a Ph.D. in the mathematical sciences. He was under no undue pressure to diminish his tax liability; he simply wanted to reduce the amount he paid the IRS on the sale of his considerable shareholdings in Axon. This is not remotely the stuff of a defense of unconscionability.
While the Palmers feebly claim that the limitation of liability provision in the Engagement Letter agreement is unconscionable, their primary (and more interesting) defense to its enforcement is that the limitation of liability provision is unenforceable here because:
*279 Williams was engaging in the practice of law in Massachusetts when he conferred with Dr. Palmer in Boston on Februaiy 19, 1996 (although not authorized to do so), and
Disciplinary Rule 6-102, which was in effect at that time, provided, “A lawyer shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice.” Supreme Judicial Court Rule 3:07, Canons of Ethics and Disciplinary Rules, D.R. 6-102 (effective October 2, 1972).[1]
The defendants contend that D.R. 6-102 does not apply to this limitation of liability for three reasons. First, they contend that the Annuity Transaction involved the creation of a Jersey trust which would establish a Jersey corporation that would exchange Dr. Palmer’s shareholding in Axon in exchange for a deferred lifetime annuity. Therefore, they contend, the ethical rules that should govern Williams’s relationship to Dr. Palmer are the rules of Jersey, which did not prohibit an attorney from contractually limiting his liability for professional malpractice, not the rules of Massachusetts, which did (and still do). This Court does not accept this proposition.
“The justification for excluding from the practice of law persons not admitted to the bar is to be found, not in the protection of the bar from competition, but in the protection of the public from being advised and represented in legal matters by incompetent and unreliable persons, over whom the judicial department could exercise little control.” Lowell Bar Ass’n v. Loeb, 315 Mass. 176, 180 (1943). See also Matter of Shoe Manufacturers Protective Assn., 295 Mass. 369, 372 (1936) (“The purpose of the requirement of a license as a condition of the right to practise law ... is not to protect the practitioner, but to protect the public”). Applying that appropriate principle to the issue of whose ethical rules should apply, it is plain that, if the purpose of the ethical rules is to protect the public from being poorly advised or represented, the focus should be on protecting Massachusetts clients who receive legal advice or representation from those practicing law in Massachusetts. See In re Chimko, 444 Mass. 743, 752-53 (2005) (finding that limited practice of law by out-of-state attorney did not contravene the Massachusetts professional conduct rules, noting that the services did “not involve either rendering legal advice to or soliciting Massachusetts clients, or even engaging in a legal contest in a Massachusetts forum on behalf of an out-of-State client”). Here, the advice that Williams gave, embodied in his Engagement Letter, was made to a Massachusetts resident in Massachusetts. If he was indeed practicing law when he gave that advice, which this Court will address later, he was practicing law in Massachusetts. The fact that the legal advice involved establishing a foreign trust and a foreign corporation may be relevant as to whose law may govern the formation of that trust and corporation, but it is not relevant as to whose rules of professional conduct apply to the advice itself. If the Supreme Judicial Court wishes to protect Massachusetts clients from unscrupulous attorneys practicing law in Massachusetts, as it does, then the Massachusetts rules of professional conduct must govern the conduct of that attorney when he practices law in Massachusetts, even if the legal advice he gives is to be implemented in another state or foreign nation.
Second, the defendants point to the Introduction to Rule 3:07, which declared, “The practice of law by members of the Massachusetts Bar shall be regulated by the Canons of Ethics and Disciplinary Rules,” and argue that the advice Williams provided regarding the Annuity Transaction did not constitute “the practice of law” in Massachusetts and therefore is not governed by D.R. 6-102.
In Lowell Bar Ass’n, the Supreme Judicial Court observed:
It is not easy to define the practice of law. Since it undertakes to determine all controversies as to rights that may arise among men, the law pervades all human affairs. This has become increasingly evident in recent years. Statutes familiar to everyone have made almost every citizen feel the heavy hand of the law, helping him or hampering him, often adding to his financial burdens, and markedly increasing his dependence upon experts, especially in law and in accounting.
The proposition cannot be maintained, that whenever, for compensation, one person gives to another advice that involves some element of law, or performs for another some service that requires some knowledge of law, or drafts for another some document that has legal effect, he is practicing law. All these things are done in the usual course of the work of occupations that are universally recognized as distinct from the practice of law.
Lowell Bar Ass’n v. Loeb, 315 Mass. at 180-81. The Court added:
The work of an accountant necessarily brings him into touch with rules of law which he must understand if his computations and conclusions are to stand the test of possible litigation. He must know the nature and general legal effect of negotiable instruments, patent rights, corporate stock and bonds of different kinds, insurance policies, and other contracts. He must appreciate the distinction between buying goods, and taking them as bailee, agent, broker or factor. He could hardly prepare a correct account for a partnership without a working knowledge of the main principles of the law of partnership. In preparing an account for a trust estate, he must understand the difference between principal and income, and the rules of law governing the allocation of receipts and expenses to the one or the other. Income taxes have produced a flood of judicial decisions and departmental rulings *280 with which he must have adequate acquaintance, even though he merely works with figures and does not draft tax returns. A sharp line cannot be drawn between the field of the lawyer and that of the accountant. Some matters lie in a penumbra. But any service that lies wholly within the practice of law cannot lawfully be performed by an accountant or any other person not a member of the bar.
Plainly the commencement and prosecution for another of legal proceedings in court and the advocacy for another of a cause before a court, in cases relating to taxes as in other cases, are reserved exclusively for members of the bar. Doubtless the examination of statutes, judicial decisions, and departmental rulings, for the purpose of advising upon a question of law relative to taxation, and the rendering to a client of an opinion thereon, are likewise part of the practice of law in which only members of the bar may engage.
Id. at 182-83 (footnotes omitted).
The Supreme Judicial Court in 1943 specifically chose not to decide whether the right granted to non-lawyers by federal tax authorities to practice before them impliedly allowed them to practice tax law in Massachusetts. It declared:
Neither do we consider at this time whether the permission granted to certified public accountants and other persons not members of the bar to prac-tise in tax matters by the rules of the United States Treasury Department and of the administrative tribunal now called the Tax Court of the United States, can have the effect of granting by implication to holders of “Treasury enrollment cards” a right to perform in this Commonwealth services in connection with Federal taxes which in their nature are comprised in the practice of law. It may deserve consideration whether the rules of a Federal administrative tribunal can legalize acts done in the States in matters not actually before the tribunal, though of a class that might eventually come before it.
Id. at 184-85 (footnotes and citations omitted). By 1980, however, the Supreme Judicial Court appears to have decided that non-lawyers authorized to practice before the IRS do not engage in the unauthorized practice of law in Massachusetts by doing so. In considering whether a certified public accountant’s fee agreement with a tax client should be rescinded because the CPA engaged in the unauthorized practice of law in handling the tax matter alone through the IRS Appellate Division, the Supreme Judicial Court found:
There was nothing unlawful or questionable about Wilson’s work as an advocate and negotiator through the Appellate Division, including not only the element of auditing involved but also the work of analyzing the statute and decided cases, and then arguing the matter on both phases. Wilson was entitled to and did “practice before the Internal Revenue Service” pursuant to Treasury Department Circular No. 230 (revised through 1966).
Joffe v. Wilson, 381 Mass. 47, 51 (1980).[2] It would make little sense to find that a CPA or tax planner who was authorized to practice before the IRS was not engaged in the unauthorized practice of law when he argued with the IRS (and litigated administratively within the IRS) on behalf of his client about the legal interpretation of the Internal Revenue Code, but was engaged in the unauthorized practice of law when he gave the tax advice to the client that became the subject of the dispute with the IRS. For all practical purposes, a CPA or tax planner authorized to practice before the IRS may provide advice to a client regarding tax law, even as to arcane matters of tax law, without engaging in the unauthorized practice of law, provided he does not hold himself out as an attorney.
Therefore, if Ernst & Young’s advice regarding the Annuity Transaction had been provided by Allen (the CPA) or Coplan (the tax planner), they could not be found to have engaged in the unauthorized practice of law, provided they were authorized to practice before the IRS. The legal advice summarized in the Engagement Letter, however, was signed by Williams and was specifically characterized on the first page, in capital letters and bold print, as “PRIVILEGED OPINION and ADVICE OF COUNSEL.” By so characterizing the Letter, Williams effectively informed Dr. Palmer that he was receiving the legal advice of an attorney. When a person provides legal advice about sophisticated tax matters and asserts that he is providing this advice as an attorney, the attorney is engaging in the practice of law. See Lowell Bar Ass’ n v. Loeb, 315 Mass. at 183. If that person is not an attorney licensed to practice law, then that person is engaged in the unauthorized practice of law and the judiciary must take appropriate steps to protect “the public from being advised and represented in legal matters by incompetent and unreliable persons, over whom the judicial department could exercise little control.” Id. at 180.
Certainly, if Williams were not truly an attorney licensed to practice law in at least one state of our United States, this Court would find that he was engaging in the unauthorized practice of law when he held himself out as an attorney offering legal advice regarding complex tax matters. Williams, however, was an attorney licensed to practice in one of our fifty states, albeit not in Massachusetts. Therefore, this Court must grapple with the question of whether a tax attorney authorized to practice law in another state is prohibited from offering legal advice in Massachusetts to a Massachusetts resident regarding federal income tax issues without either being admitted to the Massachusetts Bar or obtaining admission pro hac vice. This Court finds that he is not so prohibited.
The IRS regulations in effect in 1996, when the Engagement Letter was prepared, provided:
*281 Any attorney who is not currently under suspension or disbarment from practice before the Internal Revenue Service may practice before the Service upon filing with the Service a written declaration that he or she is currently qualified as an attorney and is authorized to represent the particular parly on whose behalf he or she acts.
31 C.F.R. §10.3(a). Under this regulation, any qualified attorney who had not been disciplined by the IRS with a suspension or disbarment could practice before the IRS with his client’s authorization. Since the Supreme Judicial Court has held that a CPA who is authorized to practice before the IRS may advise and represent a Massachusetts client in sophisticated federal tax matters in Massachusetts, see Joffe v. Wilson, 381 Mass. at 51, then, a fortiorari, an attorney authorized to practice law in another state who has not been disciplined by the IRS with a suspension or disbarment should also be permitted to advise a Massachusetts client in sophisticated federal tax matters without first being admitted to the Massachusetts Bar. Not only is this conclusion dictated by logic and precedent, but any other conclusion would create havoc for clients seeking tax advice. If a Massachusetts client were to seek legal advice from a large national law firm with an office in Boston regarding a difficult federal tax matter, it would be foolish to deprive that client of the benefit of the advice he may obtain from the law firm’s best expert on that subject simply because that expert is a member of the New York Bar rather than the Massachusetts Bar. It would be even more foolish to require the client to have to travel to New York to obtain that advice, or to require the New York attorney to attempt to seek admission pro hac vice to the Massachusetts Bar so that he could advise this Massachusetts client.[3]
Therefore, this Court finds that Williams was engaged in the practice of law when he offered the legal advice summarized in the Engagement Letter. This Court also finds that, since Williams was a member in good standing of the Bar in one of our fifty states and had not been disciplined by the IRS with a suspension or disbarment, he was not engaged in the unauthorized practice of law.
Having so found,, this Court must confront the defendants’ third argument as to why the prohibition in D.R. 6-102 should not apply to this limitation of liability provision. This third argument, like the second, is based on the Introduction to Rule 3:07 — "The practice of law by members of the Massachusetts Bar shall be regulated by the Canons of Ethics and Disci-plinaiy Rules ..." (emphasis added). The defendants contend that D.R. 6-102 did not apply to Williams because he was not a member of the Massachusetts Bar. According to this argument, Williams’s conduct is governed by the rules of the Bar to which he belongs, even if he is practicing law in Massachusetts, not the rules of the Bar in Massachusetts.
It is certainly true that disciplinary sanctions for violations of Massachusetts disciplinary rules in 1996 could only be imposed against attorneys admitted to practice law in Massachusetts, whether as a member of the Massachusetts Bar or through admission pro hac vice to the Massachusetts Bar. See Rules of the Board of Bar Overseers, §1.2 (defining a “respondent or respondent attorney” as “[a]n attorney admitted to or engaging in the practice of law in this Commonwealth or any attorney specially admitted by a Court in this Commonwealth for a particular proceeding . . .”). However, the issue before this Court is not whether Williams should be disciplined for allegedly violating D.R. 6-102. Rather, the issue is whether this Court will enforce a provision in a contract that limits liability for legal malpractice, or declare that provision unenforceable as a violation of public policy.
Surely, if Williams were a member of the Massachusetts Bar and violated D.R. 6-102 by including such a provision in a contract with a client, this Court would not enforce that limitation of liability against the client. See, e.g., Guenard v. Beck, 387 Mass. 802 (1982) (refusing to enforce contingent fee contract in divorce proceeding when such an agreement violated the prohibition against contingent fee contracts in such cases); Young v. Southgate Development Corp., 379 Mass. 523 (1980) (refusing to enforce contingent fee agreement that was not signed by the client, in violation of D.R. 2-106(C)). The Supreme Judicial Court no doubt prohibited members of the Massachusetts Bar from entering into such contractual limitations of liability because it wished, to protect clients both from having inadequate redress for legal malpractice and from the risk that attorneys would be more prone to engage in malpractice if they had limited the extent of their liability on malpractice claims. Cf. Lowell Bar Ass’n v. Loeb, 315 Mass. at 180 (disciplinary rules intended to protect public from incompetent and unreliable attorneys); Matter of Shoe Manufacturers Protective Assn., 295 Mass. at 372. This purpose would in large part be vitiated if such a contract would be enforced in a court of law, even if the attorney were disciplined by the Board of Bar Overseers for having entered into it.
Since the ultimate purpose of D.R. 6-102 is to protect clients, this Court would also not enforce a limitation of liability provision in a contract for legal services between a Massachusetts resident and an attorney who is not a member of the Massachusetts Bar but is authorized to represent Massachusetts clients in federal tax matters because he is authorized to represent clients before the IRS on federal tax matters. A tax attorney may not be subject to discipline by the Board of Bar Overseers for entering into an agreement containing such a provision but the concerns regarding the need to protect clients from such provisions are equally applicable. Nor could a national law firm with an office in Boston limit its *282 liability for legal malpractice simply by asking a New York tax attorney in its Boston office to prepare and execute the engagement letter on behalf of the law firm. The bottom line is that attorneys and law firms engaged in the practice of law in Massachusetts, regardless of whether or not they are members of the Massachusetts Bar, cannot contractually limit their liability to their Massachusetts clients for legal malpractice and this Court will not enforce such a provision if they were to try.
The prohibition against limiting liability, however, does not generally extend to accounting firms or consulting firms or even tax planning firms, who, like other commercial entities, are free to negotiate limitation of liability provisions with their clients, provided they are clearly stated and not oppressive. See generally Canal Elec. Co. v. Westinghouse Elec. Corp., 406 Mass. 369 (1990) (enforcing limitation of liability provision when it is “a reasonable accommodation between two commercially sophisticated parties”). In short, limitation of liability provisions are in violation of public policy and therefore unenforceable only when they are contained in an agreement between a client and an attorney or a law firm, not an agreement between a client and an accounting or tax planning firm. Nor does this Court know of any law, either statutory or based in the common law, that provides that a court shall not enforce such a limitation of liability provision when the accounting or tax planning firm’s negligent error was committed by an attorney in that firm rather than a CPA. Nor would such a law make any sense, because it would serve to discourage these accounting and tax planning firms from employing attorneys to resolve difficult tax issues, since the involvement of such attorneys would deny them the opportunity of limiting their liability for any negligent acts.
Since Williams was acting on behalf of Ernst & Young, not a law firm, when he provided Dr. Palmer with the Engagement Letter, this Court does not find that the limitation of liability provision violates the public policy embodied in D.R. 6-102 and is unenforceable. In short, this Court will enforce reasonable limitation of liability provisions entered into between an accounting firm and a client, even if the accounting firm is providing legal advice and employed an attorney to assist in the provision of that legal advice. It will not enforce similar provisions between a Massachusetts client and a law firm, whether that firm be a sole practitioner or a national firm. As a result, the defendants’ motion for partial summary judgment is allowed and this Court declares that the defendants’ liability in this action is limited to £1 million, including interest and costs.
ORDER
For the reasons stated above, the defendants’ motion for partial summary judgment is ALLOWED. This Court declares that the defendants’ liability in this action is limited to £1 million, including interest and costs.

Since the transaction in question occurred on February 19, 1996, the applicable standards of professional responsibility were not those established in the current Supreme Judicial Court Rule 3:07, Rules of Professional Conduct, which took effect on January 1, 1998, but those declared in the predecessor Supreme Judicial Court Rule 3:07.

The Supreme Judicial Court’s finding in this regard may have been determined by the United States Supreme Court’s decision in Sperry v. State of Florida ex. rel the Florida Bar, 373 U.S. 379 (1963), which held that the federal preemption doctrine barred a state from applying its rule against the unauthorized practice of law to a layman licensed by the United States Patent Office to practice before it. In a footnote, the Supreme Judicial Court in Joffe observed, ‘The plaintiff does not suggest that a State could choose to regard practice by certified public accountants before the IRS within Treasury Dep’t Circ. No. 230 as illicit practice of law so far as carried out within the State, and prohibit it as such.” Joffe, 381 Mass. at 51 n.5, citing Sperry v. Florida, 373 U.S. at 399-400 & n.43.

In the absence of a filed case, it is not clear precisely how the New York attorney would seek admission pro hoc vice from a Massachusetts court.