ALAN FRISHMAN & others[1] vs. ROBERT A. MAGINN, JR.

No. 08-P-307.

Suffolk. December 4, 2008. - August 28, 2009.

Present: GRASSO, KATZMANN, & SIKORA, JJ.

*Practice, Civil,* Summary judgment. *Contract,* What constitutes, Performance and breach, Sale of securities. *Public Policy. Securities,* Sale. *Estoppel. Consumer Protection Act,* Unfair or deceptive act. *Words,* "Unregistered securities," "Unaccredited investors."

In a civil action alleging that the defendant had committed a breach of a contract in which he purportedly agreed to assign certain shares of stock of a privately held company to the plaintiffs, who were known to be acting as part of an investment group that included unaccredited investors, the judge did not err in dismissing the plaintiffs' claim, where, although a contract concerning the transfer of the shares existed between the parties [110-112], that contract contravened the principles behind the Securities Act of 1933, 15 U.S.C. §§ 77A et seq. (act), and regulation D, 17 C.F.R. §§ 230.501-230.506 (2007), issued pursuant to the act, which prohibits the sale of unregistered securities in nonpublic offerings to "unaccredited investors," and was therefore void and unenforceable [112-118].

In a civil action alleging breach of contract and violation of G. L. c. 93A, the trial judge properly dismissed the defendant's counterclaim of fraud in the inducement based on his determination that the parties' contract was unenforceable [118]; further, the judge properly determined that the plaintiff had not breached a prior settlement agreement by bringing the G. L. c. 93A claim in the current action [118-119].

CIVIL ACTION commenced in the Superior Court Department on February 13, 2004.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment.

*Thomas V. Urmy, Jr. (Michelle H. Blauner* with him) for the plaintiffs.

*Alan D. Rose (Nicholas J. Rosenberg* with him) for the defendant.

KATZMANN, J. In this case, we consider the applicability of

[1] Richard Simon, Joan Frishman, and Sheila Nassberg.

regulation D, 17 C.F.R. §§ 230.501-230.506 (2007), issued pursuant to the Securities Act of 1933, 15 U.S.C. § 77A et seq., which prohibits the sale of unregistered securities in nonpublic offerings to "unaccredited investors." The plaintiffs, Alan Frishman (Frishman), Richard Simon, Joan Frishman (Joan), and Sheila Nassberg filed a two-count complaint against the defendant, Robert A. Maginn, Jr. Count one alleged that the defendant breached a contract in which he purportedly agreed to assign to the plaintiffs certain shares of stock of iBasis, Inc. (iBasis), an Internet-based privately held company. Count two alleged that in breaching the contract, the defendant also committed unfair and deceptive practices in violation of G. L. c. 93A. The defendant filed counterclaims with respect to each count. Ultimately, a Superior Court judge ordered summary judgment dismissing all of the plaintiffs' claims and the defendant's counterclaims. The plaintiffs filed an appeal from the judgment dismissing the breach of contract claim only. The defendant noticed an appeal from the dismissal of his counterclaims. We affirm.

1. *Background.*[2] a. *The Jenzabar investment.* The defendant and Frishman first came into contact in May or June of 1999. At that time, the defendant, who was a partner at Bain & Company (Bain), was raising capital for a privately held company called Jenzabar, Inc. (Jenzabar).[3] Charles Farkas, also a partner at Bain and a common acquaintance of the defendant and Frishman, asked Frishman if he would be interested in making an investment in Jenzabar. Frishman responded that he would be interested in making such an investment. Shortly thereafter, the defendant contacted Frishman to discuss Frishman's possible investment. Frishman confirmed to the defendant that he would like to proceed with the investment.

On May 27, 1999, a limited liability company known as New Media Investors II, LLC (NM II), was formed as a vehicle for investing in unregistered securities of Jenzabar. Participation in NM II was limited to "accredited investors."[4] The defendant became the managing partner of NM II.

[2] The relevant facts are undisputed.

[3] At that time, Jenzabar was called CollegeNet, Inc. The company was a leading provider of enterprise software to colleges and universities; it was formed in 1998 by the defendant's then fianceé (now wife), Ling Chai.

[4] See Part 2b, *infra.*

In or about June of 1999, Frishman informed a number of his friends and family members about the investing opportunity with Jenzabar. Thereafter, he assembled a group of investors that invested a total of $200,000 in Jenzabar via NM II. The group included Frishman himself, Simon, Jack Frishman (Jack), Edward Nassberg (Edward), Kenneth Gross, Yun Peng Wei, Gang Xiao, and Lily E. Deng.

On various dates in June of 1999, Frishman, Simon, Jack, Edward, and Gross made their investments.[5] The defendant advised Frishman that neither Deng, nor Wei or Xiao, could invest directly in Jenzabar because none of them was an accredited investor.[6] The defendant further informed Frishman that if those individuals wanted to invest in Jenzabar, they would have to do so through Frishman. Accordingly, on June 14, 1999, Frishman sent one of his own checks in the amount of $13,000 to Jenzabar as an investment through NM II on behalf of Deng, Wei, and Xiao.[7]

b. *The iBasis investment.* In 1996 or 1997, the defendant and other partners at Bain decided to invest in iBasis, Inc. The investment was done through an entity known as Sunapee Securities, Inc. (Sunapee). Sunapee purchased unregistered shares of series A convertible preferred iBasis stock (iBasis A shares) for $1 per share in December, 1997, and June, 1998. This stock would automatically convert into iBasis common stock upon the closing of an iBasis initial public offering (IPO). The amount of $75,000 was withheld from the defendant's compensation at Bain for purposes of his investment in iBasis through Sunapee.[8]

---

[5]On June 2, 1999, Frishman invested in Jenzabar — through NM II — $50,000 in his own name and $12,000 in his daughter Dana's name. By check dated June 8, 1999, Jack, in his wife Joan's name, invested $25,000. By check dated June 9, 1999, Edward, in his wife Sheila Nassberg's name, invested $25,000. Also, at about the same time, Gross, in his wife Felicia Gross's name, invested $25,000. By check dated June 21, 1999, Simon invested $50,000.

[6]Deng attempted to invest $5,000 in Jenzabar; however, because she was not an accredited investor, the defendant returned to her $5,100 (her attempted investment, plus agreed upon interest of $100).

[7]Later in June, 1999, Frishman accepted — as reimbursement — $5,000 from Deng, $5,000 from Wei, and $3,000 from Xiao.

[8]Thus, the defendant owned an interest in 75,000 of the iBasis Series A shares purchased by Sunapee.

In the first or second quarter of 1999, iBasis decided to offer unregistered series C convertible preferred shares (iBasis C shares). In June, 1999, New Media Investors III, LLC (NM III), was created to allow Bain partners with preemptive rights to acquire interests in the iBasis C shares. Like the iBasis A shares, the iBasis C shares automatically converted into iBasis common stock upon the closing of an iBasis public offering and all purchasers had to be accredited investors.

iBasis issued its C shares to NM III on July 12, 1999, at a price of $4.37 per share. The defendant contributed $340,062 to the capital of NM III for the purchase of iBasis C shares thereby acquiring an interest in 77,817 iBasis C shares through NM III.[9] In issuing these unregistered shares, iBasis relied upon the exemption from the registration requirements of the Securities Act of 1933 set forth in regulation D (17 C.F.R. §§ 230.501-230. 506). As part of their purchase of iBasis C shares, all purchasers were required to represent and warrant that they were "accredited investors."

c. *Plaintiffs' participation in the iBasis investment.* On August 10, 1999, the defendant suggested to Frishman that he might be able to offer him some unregistered shares in iBasis. In the subsequent telephone conversation, the defendant told Frishman that he hoped to provide Frishman with $40,000 worth of unregistered pre-IPO shares of iBasis in gratitude for the $200,000 that Frishman raised for Jenzabar. The defendant also told Frishman that iBasis was planning an IPO in late 1999 and that the iBasis shares which he would be assigning to Frishman would be "locked up" for a period of six months following the IPO. Later on August 11, 1999, Frishman sent an electronic mail message (e-mail) to the defendant, setting forth his understanding of the proposed assignment from the defendant's NM III position, which read, in relevant part:

> "I am posting to you a check for $40,000 to cover the 20% 'linkage' in [iBasis] through New Media III based on our group's $200,000 investment in Jenzabar. The group

[9]This purchase covered both the defendant's initial allotment and the "extra" shares he had picked up from those Bain partners who decided not to exercise their preemptive rights.

consists of the following accredited investors (Jenzabar investment):

"Dick Simon ($50,000)
 Alan Frishman ($50,000)
 Jack Frishman ($25,000)
 Ed Nassberg ($25,000)
 Ken Gross ($25,000)

"The remaining $25,000 is a consortium (boy, is that an overstatement or what?) headed by Dana's trust and including 3 other friends of [Deng]. This stock is held in my name given the eventual investment accreation [*sic*] requirement in Jenzabar."

Further, Frishman asked the defendant to let him know when the check got deposited, so that Frishman could ask his co-investors for reimbursement

On August 12, 1999, Frishman sent an e-mail to Simon, Edward, Gross, Xiao, and Deng informing them of the proposed assignment from the defendant's NM III position. Frishman indicated in the e-mail that the proposed assignment was not certain yet. He also advised that, "[a]s an insider, however, we will have to hold the stock before we can sell it for 6 months from the IPO date."

The defendant replied to Frishman's August 11, 1999, e-mail on August 12, 1999, stating, in part:

"[T]hank you for your email. I will have the lawyer draft an assignment from my new media III position to you and your group, your share will be 75k over 200k and the rest as indicated in your email. As you know only accredited investors can invested [*sic*] in New Media II or III. Have a great trip. I believe the lawyers should have the assignment drafted by-next week so I would go ahead and ask for the others to reimburse you next week and I will deposit your check then too."

On August 12, 1999, Frishman mailed a check to the defendant for $40,000; the check was deposited on August 30, 1999. In October of 1999, Frishman received reimbursements from Simon ($10,000), Nassberg ($5,000), Jack ($5,000), Xiao ($600),

Wei ($1,000), and Deng ($1,000). Frishman's co-investors Xiao, Wei, and Deng remained unaccredited investors. Gross never sent Frishman any money for the proposed assignment; thus, his share was picked up by Frishman.

At the time he sent his $40,000 check to the defendant, Frishman expected to receive a document confirming the defendant's assignment of the iBasis shares to him and his co-investors. As of October 7, 1999, Frishman advised Edward that the iBasis opportunity "is not yet fully resolved." What Frishman meant was that he had not yet received the necessary paperwork from the defendant. At the time, Frishman was concerned; he testified that "[i]f it turned out to be a huge successful deal and [the defendant] decided it's too good a deal and changed his mind, [that he, Frishman] could have a problem."

iBasis had its IPO on November 10, 1999. On November 11, 1999, Frishman sent the defendant an e-mail in which he stated, "When you get a chance, can you please get us the [iBasis] paperwork." On November 13, 1999, the defendant responded to Frishman, stating, in part:

> "Thanks for your email . . . Lets [*sic*] keep thinking what we can each do to help iBasis make its numbers. New Media III will be locked up for at least 6 months and IBAS (the name under which basis was traded on the NASDAQ National Market Systems) may well be a stock for the ages like ATT.
>
> Thanks for the attached email since I was confused about which one you referred too [*sic*] on the phone. As indicated in the old email, I have only deposited your 40K and will leave you to deal with the others. They are only in new media because of you and I dont [*sic*] have time as this 430am email attests to deal with these small amounts . . . ."

d. *Frishman's involvement with Jenzabar.* In November, 1999, Frishman had a series of meetings with the defendant and Chai, which resulted in their offering him a position at Jenzabar as its senior vice president for operations. On January 31, 2000, Frishman was discharged by Jenzabar on bad terms. During the brief time that Frishman was employed by Jenzabar, he saw the defend-

ant "when he would come over to the Jenzabar office, frequently, on a daily basis." The defendant and Frishman never discussed the $40,000 that Frishman had given the defendant on behalf of himself and the other investors for the proposed assignment of the defendant's NM III position.

On May 15, 2000, Frishman filed an action against Jenzabar, Chai, the defendant, and NM II asserting claims arising out of his employment with Jenzabar (Jenzabar litigation). About two months after attempted mediation of the Jenzabar litigation, the defendant's attorney, on April 11, 2002, enclosed a check for $40,000 from the defendant representing a return of the money given by Frishman to the defendant for the proposed assignment of the defendant's NM III position. By letter dated May 3, 2002, Frishman advised the defendant's attorney that he would credit the $40,000 check against the damages owed to him by reason of the defendant's breach of his contract to sell the iBasis shares, but not in full satisfaction of the amount owed.

The Jenzabar litigation was ultimately resolved by a release and settlement agreement (Jenzabar settlement agreement) dated October 31, 2002. While the Jenzabar settlement agreement preserved Frishman's right to pursue claims relating to the proposed investment in iBasis, it specifically stated that it was intended to resolve "all matters relating to the [Jenzabar] litigation."

e. *Distribution of the iBasis shares.* On March 7, 2000, Frishman heard from Farkas that iBasis was contemplating a secondary offering in which ten percent of all the iBasis common stock owned by the members of NM III would be sold, including ten percent of the Frishman group's interest. Frishman informed his co-investors about that. The iBasis shares were sold in the secondary offering around March 15, 2000. On March 21, 2000, when the prices of the stock had risen to above $90 per share, Frishman sent an e-mail to the defendant, inquiring as to when he could expect to receive his shares. The defendant never responded to that e-mail.

As NM III purchased the iBasis shares on July 12, 1999, the defendant and other NM III members could sell their shares one year later, upon the expiration of the lock-up period, on July 12, 2000. When the lock-up expired, NM III distributed 77,816 iBasis shares to the defendant.

The defendant held all of the iBasis C shares distributed to him until January 14, 2005. On that day, he sold 44,000 shares at $1.871 per share, pursuant to a stop loss order of $2.00 per share implemented on September 29, 2004. Overall, the defendant lost $2.50 per share, since he had paid $4.37 per share for his interest through NM III.

The plaintiffs claim that had the defendant delivered to the plaintiffs the balance of their 9,193 iBasis shares on July 12, 2000, the plaintiffs would have received stock worth an additional $320,901.73.

2. *Discussion.* Our analysis proceeds under familiar summary judgment principles. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711 (1991). As we have noted, the relevant facts here are essentially undisputed; thus, we review the record to determine if either party is entitled to judgment as matter of law. *Nelson* v. *Salem State College*, 446 Mass. 525, 530 (2006). See *Buchanan* v. *Contributory Retirement Appeal Bd.*, 65 Mass. App. Ct. 244, 247 n.5 (2005) ("Because the interpretation of the terms of a contract or agreement is a pure question of law, we exercise de novo review over this issue").

We focus first on the breach of contract claim alleged by the plaintiffs in count one, and the defendant's contentions that the claim must fail because there was no contract, and that, as a result of Frishman's inclusion of unaccredited investors in his group, enforcement of the alleged contract would violate the public policy underlying Federal securities laws and regulations. We then address the defendant's appeal of the dismissal of counts one and two of his counterclaims.

a. *Existence of a contract between the parties.* As did the judge, we begin our analysis with the basic issue of whether there was a contract formed between the defendant and the plaintiffs concerning the sale/transfer of the iBasis shares.

"It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. 875, 878 (2000). However, not every last term need be specified. We recognize that an agreement may be enforceable that anticipates a more formal writing, but in such a

case, the parties must have agreed upon either the material terms, or upon the "formulae and procedures" that will provide the material terms at some future date. See *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. 509, 518 (1998) (purchase option provision constituted a binding preliminary agreement because the parties specified an arbitration mechanism to resolve open term questions). See also *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, *supra* at 878-879 (oral agreement to extend agency relationship was a binding preliminary agreement where the parties had signed three previous contracts with substantially the same terms); *Goren* v. *Royal Invs. Inc.*, 25 Mass. App. Ct. 137, 139 (1987) (preliminary agreement for purchase and sale of premises was binding contract where transaction was not "particularly complex" and parties agreed upon all material terms and where the unexecuted purchase and sale agreement was a mere "formality" containing "ministerial and nonessential terms of the bargain").

In the present case, both the defendant and Frishman expected a final written agreement, memorializing the terms of the iBasis shares' assignment, as evident by the defendant's August 12, 1999, e-mail. Despite the parties' numerous conversations pertaining to the execution of the written agreement, no document ever materialized. However, various communications that took place — both oral and written — signified the parties' intentions, as well as the specifics of the assignment. See *Situation Mgmt. Sys., Inc.* v. *Malouf, Inc.*, 430 Mass. at 878-879; *Lafayette Place Assocs.* v. *Boston Redev. Authy.*, 427 Mass. at 521.

For the defendant to be contractually obligated to the plaintiffs, the following essential elements must be present: the quantity of iBasis shares, the amount to be paid for the shares, and the time at which the shares would be delivered to the plaintiffs. See *McCarthy* v. *Tobin*, 429 Mass. 84, 86 (1999). Here, we have all of the elements demonstrating the existence of a contract between the parties. First, as the judge properly concluded, the amount of $40,000, together with the amount that the defendant paid for the shares ($4.37), provides that there were 9,153.32 shares representing Frishman's and his co-investors' interests.[10] Therefore, two key elements — the number of shares and the

---

[10]The judge found that "NM III purchased the iBasis shares for $4.37 per

price per share, are present. Furthermore, the timing of the transfer of shares to Frishman can be inferred from the surrounding circumstances and the parties' pertinent communications. As NM III purchased the iBasis shares on July 12, 1999, the defendant and other NM III members could sell their shares one year later, upon the expiration of the lock-up period, on July 12, 2000. Thus, the defendant was obligated to transfer the shares to Frishman on July 12, 2000.

Because the three key elements — signifying parties' agreement to the material terms — are present here, we hold that a contract concerning the transfer of the iBasis shares existed between the parties.

b. *Enforceability of the iBasis contract.* The defendant next argues that enforcement of the iBasis contract is against public policy as it violates the policy underlying the Securities Act of 1933 (Act) and regulation D, issued pursuant to the Act. We first examine whether regulation D is applicable and if so, whether the parties' contract violates it.

The Act prohibits sales of securities unless such sales are in compliance with registration requirements of the Act. 15 U.S.C. § 77e (2009). Hazen, Treatise on the Law of Securities Regulation, § 2.2 (6th ed. 2009). The purpose of the Act is to protect unsophisticated investors by providing full disclosure of information necessary to make knowledgeable investment decisions.[11] *Pinter* v. *Dahl*, 486 U.S. 622, 637 n.13 (1988). *Geiger* v. *Securities & Exch. Commn.*, 363 F.3d 481, 484 (2004). The Act generally prohibits the sale of unregistered securities. One exception is

share. Maginn contributed $340,062 to the capital of NM III for the shares he purchased. This resulted in Maginn acquiring 77,817.39 shares. Frishman's $40,000, at $4.37 per share would result in 9,153.32 shares."

[11]The essential purpose and intent of Congress in enacting the Act was "to protect investors by requiring publication of certain information concerning securities before offered for sale." *A.C. Frost & Co.* v. *Coer D'Alene Mines Corp.*, 312 U.S. 38, 40 (1941). The Act provides that securities must be registered with the Securities and Exchange Commission before any person may sell or offer to sell such securities. See 15 U.S.C. § 77e; *Securities & Exch Commn.* v. *Kern*, 425 F.3d 143, 147 (2d Cir. 2005). Specifically, the Act reads: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly . . . (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use of medium of any prospectus or otherwise . . . ." 15 U.S.C. § 77e(a)(1).

for the sale of stock in nonpublic offerings, the requirements for which are contained in regulation D, 17 C.F.R. §§ 230.501-506. See Hazen, *supra* at § 4.20. Central to regulation D is the "accredited investor." Rule 230.501(a) of regulation D defines the term to mean any person who comes within, or whom the issuer reasonably believes comes within, any of the eight categories of investors at the time of sale. 17 C.F.R. § 230.501(a)(1)-(8). These categories define "types of purchasers that, based on objective criteria indicating financial sophistication and ability to fend for themselves, do not require the protections of registration under the federal securities laws." 2001 W.L. 34681692 (S.E.C. Release No. 33-8041) (December 19, 2001). Generally, "accredited" investors include "wealthy and/or financially sophisticated investors such as banks, insurance companies, tax-exempt organizations, directors and executive officers of the issuer, and natural persons who have considerable net worth or large annual incomes." Hazen, *supra* at § 4.20[2][A].

It is undisputed that in issuing its unregistered securities, which were subsequently converted into iBasis common stock, iBasis relied on 17 C.F.R. § 230.506, applicable to private offerings. Furthermore, both parties agree that for purposes of the iBasis shares' issuance, all investors had to be "accredited," 17 C.F.R. § 230.501(a)(8), and that Xiao, Deng, and Wei were not accredited investors.[12] However, the plaintiffs dispute application of regulation D to their transaction. They argue that regulation D is inapplicable to the parties' contract as it only pertains to the issuer of securities, here iBasis. As the defendant is not the issuer but rather a "reseller" of the iBasis shares, the plaintiffs maintain that regulation D does not apply.[13]

---

[12]In fact, iBasis required all purchasers, including NM III, to warrant that they were accredited investors. The defendant told Frishman that only accredited investors can participate and Frishman knew that was the case. Indeed, the defendant returned $5,000 to Deng because she was an unaccredited investor.

[13]In their argument, the plaintiffs mainly rely on the preliminary notes to regulation D, which provide that "Regulation D is available only to the issuer of the securities and not to any affiliate of that issuer or to any other person for resales of the issuer's securities." 17 C.F.R. at 736. They also cite to *West Park Assocs.* v. *Butterfield Sav. & Loan Assn.*, 60 F.3d 1452, 1457 (9th Cir. 1995), which merely quotes preliminary note 4 in support of the plaintiff's argument; however, that court did not examine or decide the issue.

Instead, the plaintiffs contend that § 230.144 of Title 17 of the Code of Federal Regulations applies to the transaction. Section 230.144 pertains to resales of securities issued pursuant to regulation D. 17 C.F.R. § 230.144 (2007). It presents a "safe harbor for persons selling securities that have been acquired in a private placement or pursuant to a Regulation D exemption." Hazen, *supra* at § 4.27 at 15-16. See Hazen, *supra* at § 4.29 at 27. The re-sale under § 230.144 is permitted to unaccredited, as well as to accredited investors.[14] 17 C.F.R. § 230.144.

With regard to the plaintiffs' arguments, we agree with the judge that their position overlooks a significant principle of securities laws and regulations, which is that the registration requirements under the Act are designed not only to protect immediate recipients of the securities but also the subsequent purchasers. See *Securities & Exch. Commn.* v. *Harwyn Indus. Corp.*, 326 F. Supp. 943, 953 (S.D.N.Y. 1971). The Act "must be construed not technically and restrictively, but flexibly to effectuate [its] remedial purpose[]." *Securities & Exch. Commn.* v. *Brigadoon Scotch Distributors, Ltd.*, 388 F. Supp. 1288, 1290 (S.D. N.Y. 1975), quoting from *Securities & Exch. Commn.* v. *Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963). The "remedial purpose" and the over-all policy here is the protection of unaccredited investors; the plaintiffs' arguments ignore this principle, essentially subverting the requirements of the Act and its exemptions. See *In re Integrated Resources Real Estate Ltd. Partnerships Security Litigation*, 815 F. Supp. 620, 628 (S.D.N.Y. 1993) (purpose of "accredited" investor requirement is to preclude inexperienced purchasers and those unable to afford professional advice from participating in regulation D offerings). As the judge observed, "Frishman — and Maginn, as well — should not be able so facilely to avoid the protection of Regulation D by the

---

[14]In support of his argument, Frishman further points to a memorandum that makes references to § 230.144. In that memorandum, on June 6, 2000, Gary Wilkinson, the defendant's co-managing partner of New Media III, told the defendant and the other New Media III members that they would be able to resell their iBasis shares subject to § 230.144. With regard to the plaintiffs' § 230.144 argument, the defendant responds that the plaintiffs should not be allowed to avoid regulation D by the clever maneuvering of having iBasis issue the shares to NM III (in which the defendant had interest), and then have the defendant transfer the shares to Frishman.

simple artifice of having iBasis issue the shares to NM III, in which Maginn had an interest, and then permit Maginn to transfer or assign his interest in those very same shares to Frishman, who was known to be acting on behalf of some unaccredited investors."

Additionally, the plaintiffs' characterization of the transaction as governed by § 230.144 is unavailing. Basically, the plaintiffs claim a contractual right of the investing group — containing unaccredited investors — to receive unregistered iBasis shares upon the conclusion of the lock-up period. As the judge properly determined, however, this would in effect be an impermissible "loophole" which would gut the requirements of the Act and its exemptions.[15] Indeed, one commentator has observed, "As is the case with any safe harbor rule, [§ 230.144] will not protect a transaction that . . . is part of a scheme to evade the 1933 Act's registration requirements." Hazen, *supra* at § 4.29 at 30.

In sum, we hold that regulation D is applicable to the parties' transaction. Furthermore, the parties' contract — by putting unregistered securities issued pursuant to regulation D in the hands of unaccredited investors — violates regulation D and thereby implicates the policy behind the Act and its exemptions. Consequently, we next turn to the issue of the contract's enforceability in light of public policy.[16]

"[I]t is a principle universally accepted that the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases the contract will not be enforced." *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc.*, 422 Mass. 318, 321 (1996). In such context, "public policy" is understood to refer to the "court's conviction, grounded in legislation and precedent, that

---

[15]In arguing that the judge's determination of the "impermissible loophole" is incorrect, the plaintiffs properly note that *Securities & Exch. Commn.* v. *Harwyn Indus. Corp.*, 326 F. Supp. at 953, cited by the judge, does not involve a similar factual scenario. However, the analogy with that case is correct in that courts do not permit "loopholes" where investors are attempting to achieve an improper purpose by characterizing transactions at issue as something that they are not. *Id.* at 945, 953.

[16]As we decided that the parties' contract was in violation of regulation D, we rule as matter of law on the consequences. See *Town Planning & Engr. Assocs.* v. *Amesbury Specialty Co.*, 369 Mass. 737, 747 (1976) ("As the facts regarding the illegality are substantially beyond dispute, it was for the judge to rule as matter of law on the consequence"). See also *Hawes Elec. Co.* v. *Angell*, 332 Mass. 190, 192 (1955).

denying enforcement of a contractual term is necessary to protect some aspect of the public welfare." *Ibid.*

Courts will not go out of their way to discover an illegality in a contract, see *id.* at 320, and they proceed with great caution when determining whether the contract must be voided due to the public policy issues. *Starr* v. *J. Abrams Constr. Co.,* 16 Mass. App. Ct. 74, 81 (1983). However, it is well established that a contract violating public policy will not be enforced. *A.Z.* v. *B.Z.,* 431 Mass. 150, 160 (2000). See *Beacon Hill Civic Assn.* v. *Ristorante Toscano, Inc., supra* at 320-321.

The factors examined by the courts when determining whether a contract violating public policy should be enforced are the following: "the nature of the subject matter of the contract; what was the extent of the illegal behavior; was that behavior a material or only an incidental part of the performance of the contract . . . ; what was the strength of the public policy underlying the prohibition; how far would effectuation of the policy be defeated by denial of an added sanction; how serious or deserved would be the forfeiture suffered by the plaintiff, how gross or undeserved the defendant's windfall." *Town Planning & Engr. Assocs.* v. *Amesbury Specialty Co.,* 369 Mass. at 745-746 (footnotes omitted).

As we articulated earlier, one of the main purposes of the Act and its exemptions is the protection of unsophisticated investors in nonpublic offerings, precisely such as Deng, Xiao, and Wei[17] here. Moreover, as the judge found, "Frishman did not possess any knowledge at all that would enable him to provide his unaccredited investors the 'professional advice regarding the merits and risks of purchasing the offered securities' called for in *[In re] Integrated [Resources] Real Estate Ltd. Partnership Security Litigation,* . . . 815 F. Supp. at 628.' " Enforcement of the parties' contract would therefore violate the fundamental safeguards of the securities laws. Examining the "vector of considerations" outlined above, see *Town Planning & Engr. Assocs.* v. *Amesbury Specialty Corp.,* 369 Mass. at 746, we are of the opinion

[17]Wei, for example, is precisely the type of investor targeted for protection by regulation D. At the time of the transaction, he had recently arrived from China, did not speak English very well, was unemployed, and was living off his savings.

that the illegality here was not incidental or minor; rather, it "permeate[d] the parties' transaction." *Yankee Microwave, Inc.* v. *Petricca Communications Sys., Inc.*, 53 Mass. App. Ct. 497, 509 (2002), quoting from *Tocci* v. *Lembo*, 325 Mass. 707, 710 (1950). Furthermore, the public policy considerations are not outweighed by the plaintiffs' loss or the defendant's windfall. The full $40,000 was returned to Frishman by the defendant. There was no windfall to the defendant, as he sold his iBasis shares at a total loss of approximately $110,000.

Contrary to the plaintiffs' assertion, the contract cannot be enforced solely as to the plaintiffs. The entire agreement that the plaintiffs seek to enforce contravenes regulation D and the overall public policy behind that regulation. Specifically, and as the defendant properly notes, Frishman's group of investors qualifies as an "accredited" investor only where *all* equity owners are accredited investors. See 17 C.F.R. § 230.501(8) (emphasis added).

Finally, the plaintiffs contend that the defendant should be estopped from asserting that the iBasis contract violates public policy. See *Daynard* v. *Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115, 129 n.9 (D. Mass. 2002) (listing factors for finding estoppel).[18] We disagree. While it is true that the defendant was involved in an illegal contract, he warned Frishman that unaccredited investors could not participate, but Frishman proceeded with the investment nonetheless. Additionally, there is no evidence that the defendant induced participation of the unaccredited investors and caused, in any way, Frishman's reliance thereon. Finally, there was no detriment, as the full amount of $40,000 was returned to Frishman. Thus, we find the estoppel argument to be without merit.

In sum, we uphold the judge's determination that the parties' contract concerning the transfer of the iBasis shares to Frishman's group, which included unaccredited investors Xiao, Wei,

---

[18]"The essential factors giving rise to an estoppel are . . . (1.) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2.) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3.) Detriment to such person as a consequence of the act or omission." *Daynard* v. *Ness, Motely, Loadholt, Richardson & Poole, P.A.*, *supra* at 129 n.9, quoting from *Cleaveland* v. *Malden Sav. Bank*, 291 Mass. 295, 297-298 (1935).

and Deng, contravenes the principles behind the Act and regulation D. As the contract violates public policy, we conclude that it is void and unenforceable.

c. *The defendant's counterclaims.* The defendant appeals the judge's dismissal of counts one and two of his counterclaims. Count one — fraud in the inducement — was properly dismissed by the judge based on his determination (and our agreement with his holding) that the parties' contract was unenforceable on the public policy grounds. See *Powers* v. *Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991) (complaint that releasee defrauded releasor into signing release failed to state an actionable claim where release pertained to agreement that was, in any event, unenforceable); *Catex Vitol Gas, Inc.* v. *Wolfe*, 178 F.3d 572, 579 (1st Cir. 1999).

Count two of the defendant's counterclaims provides that Frishman breached the parties' settlement agreement pertaining to the Jenzabar litigation by bringing G. L. c. 93A claims — which were allegedly released in the Jenzabar settlement agreement — in this litigation. While the Jenzabar settlement agreement released all claims pertaining to the Jenzabar litigation, it had an important carve-out regarding Frishman's potential claims with respect to the iBasis deal:

> "Frishman does not release, waive or discharge, in whole or part, any demands, claims, actions, causes of action, suits, liens, controversies, proceedings, debts and liabilities, of every name, nature and description (including without limitation those in law, equity, negligence, tort, breach of contract, fraud, misrepresentation, or violation of G. L. c. 93A or other statute) against Maginn *arising from or relating to the investment, or alleged, promised or intended investment by Frishman in the stock of IBasis Inc. and/or New Media III, LLC and/or Maginn's interest in IBasis Inc. and New Media III, LLC . . . ."* (emphasis added).

We disagree with the defendant's characterization of Frishman's G. L. c. 93A claims as relating to the Jenzabar litigation. The essence of the Frishman's claim was that the defendant committed an unfair and deceptive act by wrongfully withholding the $40,000 paid to him by Frishman. Thus, the claim was clearly

related to the iBasis contract and it was precisely the sort of claim that was specifically exempted from the Jenzabar settlement agreement. Accordingly, we determine that Frishman did not breach the Jenzabar settlement agreement by bringing the c. 93A claim in the current litigation.[19]

For the foregoing reasons, we affirm the judgment of the Superior Court.

*Judgment affirmed.*

---

[19]As we conclude that there was no breach of the Jenzabar settlement agreement, we do not address the defendant's arguments relating to damages. Additionally, we agree with the lower court's ruling that the defendant is not entitled to recover his legal fees because they were paid by Jenzabar under an indemnity agreement.